860 A.2d 909

## MONTGOMERY COUNTY BOARD OF EDUCATION

v.

## HORACE MANN INSURANCE COMPANY.

### No. 11, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 10, 2004.

528

Sharon V. Burrell, Principal Counsel for Self-Insurance Appeals (Charles W. Thompson, Jr., County Attorney, and Joann Robertson, Chief Counsel Litigation Division, on brief), Rockville, Brian L. Moffet, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, Richard Hodyl, Jr., Thomas J. Pontikis, Michael J. Borree, Williams, Montgomery & John, Chicago, IL, Brief of the Property Casualty Insurers Association of America as Amicus Curiae in Support of Appellant, for petitioner/cross–respondent.

Charles E. Wilson, Jr., (Amy Leete Leone, on brief), Rockville, Thomas V. McCarron, Christopher J. Lyon, Semmes, Bowen & Semmes, Baltimore, Brief of Amici Curiae the Maryland Association of Boards of Education Group Insurance Pool, The Maryland Association of Boards of Education, the International Municipal Lawyers Association, for respondent/cross–petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

WILNER, J.

The Circuit Court for Montgomery County determined that the Montgomery County Board of Education was required by law to defend one of its teachers against a tort claim filed by a former student and that it was liable to the private insurance company that ultimately provided that defense for having declined to do so. The Court of Special Appeals affirmed the declaratory and monetary judgment against the board (*Board of Education v. Mann*, 154 Md.App. 502, 840 A.2d 220 (2003)), and we granted cross-petitions for *certiorari* to review those

decisions. We shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

In February, 1998, a former student in the Montgomery County school system, using the name John Doe, filed suit in U.S. District Court against the county school board, the principal (or former principal) of Wood Middle School, and Barbara Robbins, a teacher (or former teacher) at that school. The essence of the complaint was that, while a student at Wood from 1989 to 1993, Doe, then a pre-teen, was in a mentoring program in which Ms. Robbins acted as his mentor and that Ms. Robbins abused her professional relationship with him in a variety of ways, including her engagement in a sexual relationship with him.[1] We are concerned here only with the action against Ms. Robbins.

The complaint alleged, in preliminary paragraphs applicable to all of the claims against Ms. Robbins, that in the course of more than three years, she "repeatedly, sexually abused Doe by having vaginal and other forms of sex with him" and that she "abused her special relationship with Doe in numerous,

---

1. The mentoring program was adopted to "assist youngsters from a diverse ethnic and socio-economic background with academic support" and to improve communications skills. The program was geared toward "at risk" students, i.e., students who were experiencing both academic and behavioral problems.

A description of the program contained in the record explains that a mentor is expected to "spend time to teach, challenge, and support" the student. The program set forth several objectives for the mentors, one of which was to serve as a "liaison between home and school," and to provide "teacher-student interaction through formal and informal planned activities." The program description is replete with statements that suggest that a mentor is encouraged to become a significant presence in the student's life. These statements include such encouraging suggestions as, a mentor must be "ready to go the extra mile" and must provide a shoulder where "crying [is] allowed" and which is "good for leaning on."

In view of this description of Wood's mentoring program, it is clear that the scope of Ms. Robbins's employment, with respect to her relationship to John Doe, was much broader and more involved than would be the normal relationship between a teacher and student.

inappropriate ways." Doe complained, "[m]ore specifically," that she called him, bought him gifts, sent food to his home, invited him into the bedrooms and other rooms of her home, sent him love cards, wrote him love letters, provided him with transportation, and frequently had vaginal and other forms of sex with him. He added that Robbins "intentionally and inappropriately interfered with his parents and guardians by inappropriately blending and confusing the roles of mentor, teacher, lover, friend and parent" and that, as a result of her wrongful acts, Doe suffered severe mental and emotional distress and economic and psychic damage.

Maryland Code, § 4–105 of the Education Article requires county school boards to carry comprehensive liability insurance to protect the board and its agents and employees but permits the boards to satisfy that requirement through a self-insurance program. The Montgomery County school board elected to become part of the self-insurance program established by Montgomery County pursuant to Maryland Code, title 19, subtitle 6 of the Insurance Article and Montgomery County Code, § 20–37.

Section 4–104(d) of the Education Article independently requires the board to provide counsel for teachers (and other employees) with respect to claims made against them if (1) the conduct complained of was in the performance of the teacher's duties, within the scope of employment, and without malice; and (2) "[t]he board determines that [the teacher] was acting within [his/her] authorized official capacity in the incident."

The county self-insurance program in which the board participates also provides for defending claims. County Code, § 20–37(c) requires the insurance program generally to provide for the defense of claims, and § 20–37(e)(2) more specifically requires the county attorney to provide a defense for claims against a participating agency or its officials or employees. There are a number of explicit and implicit conditions to the coverage provided by the county program. Section 20–37(c) authorizes the county to provide insurance to compensate for injury arising from tortious conduct of an employee "within

the scope of official duties," and an Attachment to the Participating Agency Agreement between the county and the school board states that there is no coverage for actions falling outside the scope of employment, cases of wanton or malicious wrongdoing, or intentional torts. The Attachment provides, in that regard, that in all cases involving questions of scope of employment or allegations of intentional torts or wanton or malicious wrongdoing, the county attorney shall "evaluate whether the employee is entitled to coverage, defense or indemnification, based on the facts," and, if the county attorney concludes that coverage, defense, or indemnification should be denied, make such a recommendation to an interagency panel, which would make the final administrative decision.

Ms. Robbins demanded that the board defend her in Doe's action but, upon concluding that she was being sued for actions "outside the scope of her employ," the board refused to provide her with counsel or indemnification. It appears that the ultimate decision not to provide counsel was made by the county attorney, upon recommendation of the board, rather than by the interagency panel. Eventually, Ms. Robbins was defended by Horace Mann Insurance Company pursuant to an Educators Employment Liability Policy that it had issued to the Maryland State Teachers Association. Under that policy, Horace Mann agreed to defend teachers against claims arising from an occurrence in the course of the teacher's educational employment activities but retained the right to negotiate and settle any such claim. Horace Mann settled the claim for $15,000 and then filed this action in the Circuit Court for Montgomery County seeking reimbursement from the county school board for the cost of defense and settlement and for attorneys' fees incurred in prosecuting the instant declaratory judgment action.

The action for declaratory and other relief was based on the assertion that the school board had breached its statutory duty to defend Ms. Robbins. There being no genuine dispute of material fact, and the amount of damages, if liability was found, being stipulated, the issue was presented to the court

on cross-motions for summary judgment. After examining the allegations in the Doe complaint and the extrinsic evidence produced by the parties, the court determined that there was a potentiality of coverage for Ms. Robbins under the board's self insurance and entered a declaratory judgment that the school board had a duty to defend the action, that the duty was primary to that of Horace Mann, that the board breached its duty, and that it therefore must reimburse Horace Mann for the sums it expended in defending and settling the Doe claim. The final order entered judgment against the board for the stipulated amount of $100,556.

Aggrieved by the substantive ruling as to liability, the school board appealed to the Court of Special Appeals, which affirmed. *Board of Education v. Mann*, 154 Md.App. 502, 840 A.2d 220 (2003). The intermediate appellate court treated the "gravamen" of the *Doe* complaint as charging only sexual misconduct—a sexual relationship between the teacher and the student—which, the court concluded, would not be within the scope of Robbins's employment and therefore did not produce even a potentiality of coverage under the board's self insurance program. Observing then that, under this Court's decision in *Aetna v. Cochran*, 337 Md. 98, 651 A.2d 859 (1995), it was necessary to consider not just the allegations set forth in Doe's complaint but also any extrinsic evidence called to the board's attention that might create a potentiality of coverage, the court noted that Ms. Robbins had denied the existence of a sexual relationship, that some of her co-workers had said that they were unaware of such a relationship, and that, as a result, the extrinsic evidence regarding any sexual relationship was inconclusive. Viewing the extrinsic evidence in a light most favorable to Ms. Robbins, the court concluded that "her conduct and the relationship with John Doe was potentially within the scope of employment, authorized in her official capacity, and not malicious or intentional," and that it was therefore "potentially covered" under the self insurance program. *Board of Education, supra*, 154 Md.App. at 518, 840 A.2d at 229.

We granted the board's petition for *certiorari* to consider whether (1) a county board of education is required to provide counsel to defend an action against an employee if *the board* determines that the employee's actions were outside the scope of her employment and that she was not acting within her authorized official capacity, (2) whether a claim against a teacher based on sexual abuse of a student is potentially covered under the board's self-insurance program "where the only extrinsic evidence favorable to the employee is her denial," and (3) whether the holding of the Court of Special Appeals expanded an insurer's duty to defend beyond that set forth in *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975) and *Aetna v. Cochran, supra,* 337 Md. 98, 651 A.2d 859. We also granted Horace Mann's cross-petition to consider whether the Court of Special Appeals erred (1) in holding that the allegations in Doe's complaint, alone, were insufficient to establish a potentiality of coverage, and (2) in failing to address the additional argument that the board failed to comply with its own mandated procedures in determining not to defend Robbins. Although we do not embrace all of the reasoning of the Court of Special Appeals, we find no merit in the board's arguments, some merit in Horace Mann's first argument, and none in its second argument.

## DISCUSSION

### Mandated Procedures

We shall deal first with Horace Mann's second argument. Section 20-37(e) of the county code creates an interagency insurance panel to advise the agencies participating in the county self-insurance program and to prepare a budget for the program. The code does not give the panel any responsibility for evaluating or resolving claims. The Attachment to the Participating Agreement entered into by the board and the county imposed certain additional duties on the interagency panel, however, including duties relating to the evaluation and settlement of claims. Section 3.5 of that Attachment provided that there would be no coverage for (1) claims arising from

actions falling outside the scope of employment, (2) cases of wanton or malicious wrongdoing, and (3) intentional torts. It stated that, in all cases involving those issues, the county attorney would evaluate whether the employee was entitled to coverage, defense, or indemnification based on the facts of the case and that, if the county attorney decided that coverage, defense, or indemnification should be denied, he/she would make such a recommendation to the panel. The panel would then meet, allow interested parties to be heard, and determine those issues.

■ Horace Mann complained that the decision not to provide a defense to Ms. Robbins was made by the county attorney, on recommendation of the board, and that the matter was never submitted to the interagency panel, as required by the Attachment to the Participating Agency Agreement. That complaint was not addressed by the Circuit Court, however, in its granting of summary judgment and was therefore not a basis for the summary judgment. Citing its decision in *Warner v. German*, 100 Md.App. 512, 642 A.2d 239 (1994), which, in turn, relied on *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 556 A.2d 1135 (1989) and *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 545 A.2d 658 (1988), the Court of Special Appeals observed that, when a matter is resolved by the trial court on summary judgment, the appellate court ordinarily will not affirm on any ground not relied upon by the trial court in granting the motion.

That principle is a correct one, *see Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 729 (2001), *Eid v. Duke*, 373 Md. 2, 10, 816 A.2d 844, 849 (2003), but it is not entirely applicable here. It generally governs when the appellate court is unable to affirm on any ground relied upon by the trial court and, but for affirming on a ground not relied on by the lower court, would be required to reverse, vacate, or modify the judgment. Because, in Maryland, a trial court has some discretion to deny summary judgment even when it could grant that relief, we have been reluctant to permit such judgments to be affirmed on a ground not relied upon below

and upon which, if no other ground for entering the judgment existed, the lower court could lawfully have denied summary judgment and permitted the case to proceed to trial. Here, of course, the Court of Special Appeals affirmed the summary judgment on the ground relied upon by the Circuit Court, so there was no reason for it to address as well the additional ground raised by Horace Mann.

### *Potentiality of Coverage*

The issues raised by the board and the first issue raised by Horace Mann can be considered together. The board's position is that Doe's complaint is based entirely on the claim that he was sexually assaulted by Ms. Robbins, that there is no insurance coverage for that kind of conduct because it cannot be regarded as committed within the scope of the teacher's employment or authority, that the only extrinsic evidence regarding the allegation consists of Ms. Robbins's denial that the conduct occurred, and that such mere denial is insufficient to create even a potentiality of coverage. Horace Mann insists that the complaint itself alleges more than just sexual abuse, that the extrinsic evidence also shows other potentially actionable conduct on Ms. Robbins's part, that, as a result, there *is* a potentiality of coverage, and that the board therefore had a statutory duty to defend.

■ Beginning at least with *U.S.F. & G. v. Nat. Pav. Co.*, 228 Md. 40, 54, 178 A.2d 872, 879 (1962) and continuing, most recently, through *BGE Home v. Owens,* 377 Md. 236, 246, 833 A.2d 8, 14 (2003) and *Walk v. Hartford Casualty,* 382 Md. 1, 852 A.2d 98 (2004), we have followed the rule that, where a duty to defend is included in a liability policy, the insurer is obligated to defend its insured "when there exists a *'potentiality* that the claim could be covered by the policy.'" *BGE Home, supra,* at 246, 833 A.2d at 14, quoting from *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 509, 667 A.2d 617, 619–20 (1995).

In *St. Paul Fire & Mar. Ins. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282, 285 (1981), we pointed out that, in determining

whether a liability insurer has a duty to provide its insured with a defense to a tort action, "two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy [and] (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" The first question, we added, "focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." *Id.* In *Aetna, supra,* 337 Md. 98, 651 A.2d 859, we expanded the scope of the second inquiry somewhat. We held there that, at least where the underlying complaint in the tort action neither conclusively establishes nor conclusively negates a potentiality of coverage, an insurer must examine any relevant extrinsic evidence brought to its attention that might establish a potentiality of coverage.

 Here, of course, any obligation by the county board to defend Ms. Robbins would arise from the statutory construct in §§ 4–104 and 4–105 of the Education Article and the self-insurance program in which the board has elected to participate, rather than from an insurance policy. The first aspect of our examination must therefore be the statutory framework and the self-insurance program, which, when read together and in light of other circumstances, are not entirely free of ambiguity.

As we have observed, § 4–105(a) of the Education Article requires the county boards of education to carry comprehensive liability insurance to protect the board and its agents and employees. Section 4–105(b) requires the State Board of Education to establish standards "for these insurance policies," including a minimum liability coverage of not less than $100,000 for each occurrence, and further requires the policies to "meet these standards." So far as we can tell, the only standard adopted by the State Board of Education is the unenlightening requirement that "[t]he type and amount of liability insurance carried by the local boards of education

shall conform to the requirements of Education Article, § 4–105, Annotated Code of Maryland." COMAR 13A.02.01.03A.

Section 4–105(c) permits a county board to comply with the statutory requirement through self-insurance, if: (1) the board either is "individually" insured for at least $100,000 for each occurrence under rules and regulations adopted by the Insurance Commissioner or is part of a self-insurance pool permitted under title 19, subtitle 6 of the Insurance Article; (2) if the board elects to self-insure individually, it files the terms and conditions of the self-insurance with the Insurance Commissioner; and (3) those terms and conditions are subject to approval by the Insurance Commissioner and they "conform with the terms and conditions of comprehensive liability insurance policies in the private market." [2]

The Montgomery County board elected to become part of a self-insurance pool established by local ordinance. Section 20–37(c) and (d) of the Montgomery County Code authorizes the county to provide an adequate comprehensive liability insurance program for county agencies, officials, and employees and to enter into agreements with "participating agencies" such as the county board of education. Section 20–37(e) establishes a self-insurance program for the county government and participating agencies, subject to certain conditions. One of those conditions, § 20–37(e)(3), is that the insurance protection furnished to the participating agency may not be less than the coverage provided by the independent insurance program that the agency had when it began to receive coverage under the self-insurance program.

In 1978, the county school board became part of the county comprehensive self-insurance program. The record before us does not reveal what kind of coverage the school board had when it elected to participate in the county program, notwithstanding that the Agreement provided that the insurance

---

**2.** It does not appear that the Insurance Commissioner has adopted any regulations with respect to individual self-insurance. The record does not indicate whether the Montgomery County self-insurance program was ever submitted to or approved by the Insurance Commissioner.

coverages previously in effect "shall be used as the basis for any claim payments made by the Montgomery County Self-Insurance Program for claims made against the BOARD." Through an Attachment, the Agreement between the board and the county incorporated a set of program procedures which, among other things, provided that there would be no "coverage" for "[a]ctions falling outside the scope of employment," "[c]ases of wanton or malicious wrongdoing," and "[i]ntentional torts." [3] The Attachment provided that the decision regarding whether the conduct was wanton, malicious, intentional, or outside the scope of employment would be made initially by the county attorney, subject to hearing and final decision by the interagency panel.

The key provision in § 4–105(c) is that the terms of any self-insurance must "conform with the terms and conditions of comprehensive liability insurance policies available in the private market." In *BGE Home, supra*, 377 Md. 236, 833 A.2d 8, we dealt with this very issue, albeit in the context of motor vehicle liability insurance. Pursuant to statutory authorization, BG & E elected to provide self-insurance for its motor vehicle fleet, and the issue arose whether, in the absence of any duty-to-defend provision in the self-insurance documents, it had such a duty when its employee arguably was not operating the company vehicle within the scope of permission at the time of the accident.

---

**3.** An amendment to the Agreement, dated February 1, 1979, changed the "coverage" afforded to the board in a way that created an ambiguity with respect to that exclusion. The amendment stated that "coverage" was provided for "professional liability claims," which it defined as including "liability arising out of acts or omissions, actual or alleged errors" or "neglect or breach of duty by employees or officials in the discharge of their duties." The new provision stated that the county would not "indemnify" in cases of wanton or malicious wrongdoing, or for actions outside the scope of employment or taken in bad faith, but said nothing about not *defending* cases falling into those categories. Whether, in light of the amendment, the board, through the county comprehensive liability insurance, was obliged to defend such a claim even though not obliged to indemnify the teacher for any liability is not at all clear. Fortunately, that ambiguity is not controlling in this case.

In what was essentially a three-part analysis, we concluded that the duty to defend, though not explicit in the self-insurance documents, nonetheless existed. We began first by confirming what the Court had held in *Hines v. Potomac Elec. Power Co.*, 305 Md. 369, 375, 504 A.2d 632, 635 (1986) and *West American v. Popa*, 352 Md. 455, 475, 723 A.2d 1, 11 (1998), that the General Assembly recognized approved self-insurance "as the equivalent of an insurance policy" and that there was no reason "to distinguish a certificate of self-insurance from a motor vehicle liability insurance policy." *BGE Home, supra*, 377 Md. at 246–47, 833 A.2d at 14–15. (citations omitted). That established a statutorily mandated symmetry. We then recognized that, though normally con-tractual in nature, an insurer's duty to defend "is nevertheless a fundamental feature of a basic liability insurance policy" and existed whenever there was a potentiality of coverage. That led to the conclusion that "[s]ince the duty to defend is such an important and integral part of all basic liability policies, it is highly unlikely that the General Assembly intended that motor vehicle self-insure[r]s have no duty to defend." *BGE Home, supra*, 377 Md. at 247, 833 A.2d at 15.

The same principle applies here. The basic mandate of § 4–105 is that county boards carry comprehensive liability insurance in a minimum amount of $100,000/occurrence to protect the board and its employees. That is as much a compulsory insurance requirement as the mandatory motor vehicle liability insurance. As we observed in *BGE Home*, the duty to defend is an integral feature of all basic liability policies and thus would be part of any policy that might be purchased by a county board pursuant to § 4–105(a).

A county board is permitted to self-insure only if the terms and conditions of the self-insurance "conform with the terms and conditions of comprehensive liability policies available in the private market." Under governing State law, therefore, the county board's self-insurance must be deemed to contain the same duty to defend as would exist under a standard policy, notwithstanding any contrary interpretation that might otherwise be placed on § 20–37 of the county code or the

Attachment to the Participating Agency Agreement. Under § 4–105, therefore, the board was obliged to defend Ms. Robbins if there was any potentiality of coverage.

█ The same result pertains under § 4–104, notwithstanding some ambiguity in that statute. Section 4–104(d)(1) provides, in relevant part:

"In any suit or claim brought against a [teacher] by a parent or other claimant with respect to an action taken by the [teacher], the board shall provide counsel for that individual if:

(i) The action was taken in the performance of his duties, within the scope of his employment, and without malice; and

(ii) The board determines that he was acting within his authorized capacity in the incident."

The board views § 4–104(d)(1) as establishing two separate hurdles for a teacher. First, the teacher must meet the test of sub-paragraph (i) and show that the action complained of was taken in the performance of his/her duties, that it was within the scope of his/her employment, and that it was without malice. Even if the teacher satisfies that test, the board contends that the teacher "must seek the Board's determination that she was acting in an authorized capacity in the incident."

The addition of sub-paragraph (ii) creates an ambiguous redundancy in the statute that, in light of the board's argument, needs to be resolved. Subparagraph (i) sets an objective standard for coverage—the employee was acting in the performance of his/her duties, within the scope of his/her employment, and without malice. If that test is met, the employee was necessarily acting in an authorized capacity. We cannot imagine any circumstance in which the board could properly conclude that the employee was not acting in an authorized capacity if the employee was acting in the performance of his/her duties, within the scope of his/her employment, and without malice. The question, then, is whether the Legislature, having articulated a proper objective standard, none-

theless intended that the board, in its own discretion and based on its own subjective analysis, make the ultimate decision whether to provide a defense.[1]

---

4. The statute was enacted as 1975 Md. Laws, ch. 787. As introduced, the bill would have provided an absolute, unconditional duty on the part of the board either to defend or pay the cost of defense, without regard to whether the conduct sued upon was within the employee's authority or scope of employment:

"In *any* suit or claim brought against *any* principal, teacher, school security guard, or *any* other agent or employee of the board by the parent or any other claimant, the county board of education ... *shall* provide legal counsel for, or in the alternative, may provide reimbursement for the reasonable expense of legal defense thereof for *any* principal, teacher, school security guard, or *any* other agent or employee of the board."

(Emphasis added).

Under that language, read literally, the duty to provide a defense would exist even if the employee's conduct was malicious, wholly unauthorized, and outside the scope of employment. At the hearing in the House Ways and Means Committee, an amendment offered by a witness would have added to the end of that language "if the board determines that the person sued or claimed against was acting within his authorized official capacity in the incident involved." Given the language then in the bill, that was an important, substantive amendment, intended to limit the duty to defend to cases in which the teacher acted in an authorized manner. The witness indicated that the sponsor of the bill had agreed to the amendment "in principle."

Instead of simply adopting that amendment, however, the Committee completely rewrote the proposed new section, to read, in relevant part, as follows:

"(A) The county boards of education ... may provide for legal representation as set forth in this section.

(B) In any suit or claim brought against any principal, teacher, school security guard, or any other agent or employee of any such board by the parent or any other claimant with respect to any action taken by the employee in the performance of the employee's duties within the scope of employment and without malice, the board shall provide legal counsel, which may be provided through the office of the county attorney or city solicitor for the employee of the board if the board determines that the person being sued or claimed against was acting within his authorized official capacity in the incident involved."

Without any recorded comment or evident purpose, the Committee thus tacked the amendment proposed by the witness to limit the duty to authorized conduct, verbatim, to the rewritten section, even though, through the rewriting, it had already limited the duty to defend to conduct undertaken in the performance of the employee's duties and within the scope of the employment. The current version of the law, appearing in § 4-104, was enacted in 1978, as part of the on-going

When called upon to construe an ambiguous statute, we are left, in the absence of some clear extrinsic evidence of legislative intent, to rely on the most relevant of the various canons of statutory construction. Two are paramount in this context: (1) § 4–104(d) is quintessentially remedial legislation enacted for the benefit of school employees and, as remedial legislation, it is to be liberally construed to effectuate its beneficent purpose, *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996), and (2) that section must be read in harmony with § 4–105, to which it is clearly related. In *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 77, 517 A.2d 730, 734 (1986), we applied the liberal-construction-of-remedial-legislation principle in construing the statute requiring motor vehicle insurance policies to contain personal injury protection coverage, observing that, in view of the "clear remedial purpose" of the law, "a liberal construction of the statute is required."

The relationship between § 4–104(d) and § 4–105 is evident. As we have observed, the duty to defend whenever there is a potentiality of coverage is an integral part of comprehensive liability insurance and is therefore implicit under § 4–105. Although it is the insurer, of course, that makes the initial decision whether such a potentiality of coverage exists, that decision is reviewable *de novo* by a court when properly challenged in a breach of contract or declaratory judgment action. The court, upon its own analysis, determines whether, on the facts presented, there exists a duty to defend. It would be wholly inconsistent with our case law—case law that predates the enactment of the statutes now contained in §§ 4–104(d) and 4–105 and that was therefore presumably known to the Legislature when they enacted those statutes—to construe § 4–105 as allowing the board to make its own unreviewable decision whether a potentiality of coverage exists in any given case. That being so, it would be absurd to construe § 4–

Code Revision process. The new Education Article reorganized the section and made stylistic changes consistent with code revision protocols, but effected no change in substance.

104(d), enacted to make explicit the duty to defend that was implicit in § 4–105, to achieve that inconsistent result.

We therefore reject the board's argument that there is a two-part test that teachers must pass in order to be entitled to a defense. There is only one, and that is a potentiality that the conduct at issue was undertaken in the performance of the teacher's duties, was within the scope of employment, and was without malice. That is the test to be objectively applied by the board, the county attorney, the interagency panel, and, ultimately, the court.[5]

The question, then, is whether the allegations of the *Doe* complaint and the extrinsic evidence collected by the board in its investigation of the claim demonstrate a potentiality of coverage. If, indeed, the allegations in the *Doe* complaint and the relevant extrinsic evidence established only a charge of sexual abuse, there would be no duty on the part of the board to defend Ms. Robbins. Apart from being malicious, sexual abuse of a minor is criminal conduct (*see* Maryland Code, § 3–602 of the Criminal Law Article) that is not within the scope of a teacher's employment or authority. *See Deloney v. Board of Educ. of Thornton Tp.*, 281 Ill.App.3d 775, 217 Ill.Dec. 123, 666 N.E.2d 792, 797–98 (1996), and cases cited there; also *Wolfe v. Anne Arundel*, 374 Md. 20, 821 A.2d 52 (2003) (sexual assault of citizen following traffic stop not within police officer's scope of employment). Although most of the cases establishing that principle of law dealt more

---

**5.** There is another lurking inconsistency between § 4–104(d)(1)(ii) and the Participating Agency Agreement that we need not address here but that the county or the school board may wish to consider. The statute purports to require that the board decide whether the teacher was acting in an authorized official capacity. Although in this Opinion, we conclude that the board must apply the objective standard set forth in § 4–104(d)(1)(i) and that its decision, if properly challenged, is subject to *de novo* review by the court, it appears to be the board's decision to make, not that of any other person or agency. The Participating Agency Agreement calls for the county attorney to make the decision, subject to review by the interagency panel. A problem could arise if the board decides that a defense is required and the county attorney or the interagency panel decides otherwise.

directly with whether the employer is vicariously liable for the teacher's or other employee's conduct, the principle has been applied as well to relieve the employer or insurer from the duty to defend the teacher in a civil action resulting exclusively from such conduct, a conclusion which would, in any event, naturally follow from a determination that sexual child abuse is not within a teacher's scope of employment or authority. *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993); *Queen v. Minneapolis Public Schools*, 481 N.W.2d 66 (Minn.App.1992); *cf. Pettit v. Erie*, 349 Md. 777, 709 A.2d 1287 (1998) and *Wolfe v. Anne Arundel. supra*, 374 Md. 20, 821 A.2d 52.

As in *Horace Mann Ins. Co. v. Barbara B., supra*, 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 846 P.2d 792, a case close in point factually, there was more alleged and discovered here, both in the complaint and in the available extrinsic evidence, than simply sexual abuse, and that is what dooms the board's position. As we have observed, Doe alleged in his complaint that Robbins abused her special relationship with him "in numerous, inappropriate ways," one of which was the sexual relationship that he alleged and she denied. He averred a number of other contacts of a personal nature that, if proved, a jury could find went well beyond the proper role of a teacher/mentor—personal gifts, sending food to his home, writing love letters and cards to him, inviting him into her bedroom. The extrinsic evidence collected by the board supported and enhanced those allegations. Among other things, the board discovered a letter sent to Doe by Ms. Robbins that began "Hi Sweets, I do miss you," ended with "I love you and truly miss your smiling face," and was signed "Love You! Me"; a note expressing the "assurance that you're loved, and always will be! Especially by me!" and ending with a valentine heart and the letter "B," presumably for Barbara, Ms. Robbins's first name; a valentine card signed "Love, B," and a number of other letters and cards signed "Love, Me."

Doe stated that Ms. Robbins regularly bought him food, cassette tapes, clothes, and video games, that he was at her home practically every weekend, and that he spent the night

there two or three times. He indicated that she gave him money regularly—$20 to $40 a week. Doe's mother, in deposition testimony, recalled finding in Doe's room one or two pairs of jeans costing over $100 and other expensive clothes that Ms. Robbins had bought for her son without consulting her. She said that she objected to her son having those clothes, that she objected as well to Ms. Robbins constantly bringing food to the house, that she remonstrated with Ms. Robbins, but that the gifts and the bringing of food continued. The mother objected as well to her son spending all of his time with Ms. Robbins rather than with children his own age. An attorney for the board recalled a meeting with school officials to discuss the allegations made by Doe and that the general consensus was that the evidence collected by the board "showed that the relationship, *exclusive of any sexual contact,* was an inappropriate relationship, that it had gone over the line from a teacher mentoring a student into a more personal relationship that was not appropriate and not within the behavior expected of a professional." (Emphasis added).

Although Doe's complaint could certainly have been more carefully drawn, under our conception of the duty to defend the complaint does not have to *establish* coverage but show only the *potentiality* of coverage. In ¶ 6 of his complaint, titled "Preliminary Statement and Summary of Action" and incorporated by reference in all five counts of the complaint, Doe listed the various ways in which he claimed Ms. Robbins abused her special relationship with him—the gifts, the love notes, etc.—and averred that she "intentionally and inappropriately interfered with his parents and guardians by inappropriately blending and confusing the roles of mentor, teacher, lover, friend and parent." At the end of his preliminary statement and summary, Doe alleged that "[a]s a direct and proximate result of the wrongful acts of the Defendants" he suffered damages for which he sought compensation. That covered more than just the alleged sexual abuse.

There is no doubt, as the Court of Special Appeals held, that the "gravamen" of the allegations contained in the three

counts applicable to Ms. Robbins (Counts I, II, and V) was the alleged sexual abuse, and Count II, in particular, alleging sex discrimination in violation of 20 U.S.C. §§ 1681—1688 (Title IX of the Education Amendments of 1972), seems limited to the claimed sexual abuse. Counts I and III, however, though certainly focusing on the sexual abuse, claim injuries suffered as a direct and proximate result "of the Defendants' actions and/or omissions," which potentially could be construed to include the non-sexual conduct set forth in the Preliminary Statement and Summary of Action.

On this record, it is clear that there was a potentiality of coverage for Ms. Robbins, at least with respect to Counts I and III of the complaint, and that there was therefore a duty on the board's part to defend the entire action. In light of this holding, the question raised by Horace Mann in its cross-petition for *certiorari,* whether the Court of Special Appeals erred in finding that the allegations in Doe's complaint alone were insufficient to establish a potentiality of coverage, is therefore, moot.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.