887 A.2d 673

**Suzanne N. HAAS**

v.

**LOCKHEED MARTIN CORPORATION.**

**No. 2470, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Dec. 5, 2005.

---

Laurence S. Kaye (Brian A. Loffredo, on brief), Gaithersburg, for appellant.

Michael J. Murphy (Dionne A. Parker, Ogletree, Deakins, Nash, Smoak & Stewart, PC, on brief), Washington, DC, for appellee.

Panel DAVIS, EYLER, JAMES R. and BARBERA, JJ.

DAVIS, J.

This case requires us to interpret Md.Code (1998 Repl.Vol.), art. 49B, § 42 and the Montgomery County Code § 27–19 (2001) to determine when the statute of limitations begins to run on an employment discrimination claim. Suzanne N. Haas, Ph.D., appellant, filed a complaint on October 22, 2003, in the Circuit Court for Montgomery County, alleging disability discrimination. Lockheed Martin Corporation (Lockheed Martin), appellee and appellant's former employer, responded to the complaint by filing a motion to dismiss. Because the motion to dismiss raised constitutional issues involving the Montgomery County Code, Montgomery County (hereinafter County) filed a motion to intervene on February 4, 2004, as well as a proposed opposition to appellee's motion to dismiss.[1]

---

1. Appellant filed an opposition to appellee's motion to dismiss on January 23, 2004.

Appellee filed a response to the County's motion to intervene on February 23, 2004.

The court granted the County's motion to intervene on March 5, 2004, and deemed the County's opposition to appellee's motion to dismiss as filed on that same date. Appellee filed a reply to the County's opposition on March 8, 2004. On March 9, 2004, the trial court conducted a hearing and denied appellee's motion to dismiss. The Order denying the motion to dismiss was entered on March 23, 2004. Discovery commenced and continued until late October 2004.

Appellee filed a Motion for Summary Judgment on November 1, 2004. A motion in opposition to appellee's Motion for Summary Judgment was filed on November 23, 2004, along with a Statement of Material Facts. Appellee filed a reply to appellant's opposition on December 6, 2004. Following a hearing on December 16, 2004, the court granted appellee's Motion for Summary Judgment. On January 10, 2005, appellant filed this timely appeal.[2] Appellant presents the following question for our review, which we rephrase:

> Did the trial court err by granting summary judgment to appellee on the grounds that the date of the commencement of the two-year limitations period for discrimination actions begins at the time notice of termination is received, rather than on the date of actual separation from employment?

In support of the above assignment of error, appellant also requests that we consider whether, because other events and dates cited by appellee were non-adverse, they did not rise to the level of actionable discrimination and, as a consequence, the limitations period did not begin to run until she suffered an adverse employment action.

We answer the first question above in the negative. Because we shall hold that the statute of limitations began to run when appellant received notice of her prospective termination,

---

2. Subsequent to the granting of appellee's Motion for Summary Judgment, appellee filed a Motion for Attorney's Fees. That motion was denied by the circuit court.

we decline to reach the second issue above. Therefore, we shall affirm the decision of the trial court.

## FACTUAL BACKGROUND

Appellant began working for appellee in October 1998 as a program administrator. In April of 2000, appellee created a new business area called "Corporate Shared Services," and a new department within this business area called "Learning Services." The new department was headed by Dr. Candice Phelan. Appellant began working for Dr. Phelan in April or May of 2000.

Sometime prior to being transferred to Learning Services, Amy Lowenstein, appellant's previous supervisor, told Dr. Phelan that appellant had a medical condition.[3] After her transfer to Learning Services, Dr. Phelan allegedly began making comments to appellant concerning her inability to write, to handle jobs that require planning and judgment and to pay attention to detail. According to appellant, notwithstanding Dr. Phelan's comments, she was assigned to work on presentation programs as a presenter and organizer. Appellant also claims that she was given excellent marks by individuals who attended and reviewed the programs.

On June 11, 2001, Dr. Phelan placed appellant on a Performance Improvement Plan. On June 28, 2001, Dr. Phelan met with appellant and gave her a contribution assessment in which Dr. Phelan rated appellant a "marginal contributor." Sometime in April 2001, appellant was informed that her position was being moved to another department under the supervision of Dorothea Mahan. Appellant applied, but was not hired for the transferred position under Mahan, which allegedly included all of the duties and responsibilities appellant performed in her then current position.

On September 24, 2001, appellant was removed from the Performance Improvement Plan. By letter dated October 9,

---

**3.** Appellant was diagnosed with Attention Deficit Hyperactivity Disorder in May of 2000.

2001, Dr. Phelan informed appellant that she would be eliminating appellant's position from her division, effective October 23, 2001, due to a "reduction in force." On October 23, 2001, appellant was terminated from her position at Lockheed Martin.

On December 16, 2004, the court heard oral arguments on the Motion for Summary Judgment based on the expiration of the two-year statute of limitations. Appellant, relying on the Court of Appeals' decision in *Towson University v. Conte*, 384 Md. 68, 862 A.2d 941 (2004), insisted that the limitations period did not begin to run until she was actually discharged from her position. Additionally, she claimed that the notification letter she received on October 8 or 9, 2001, nor any of the discriminatory acts she alleges took place up to that point, were sufficient to begin the running of the statute of limitations prior to her actual discharge. The Court found that *Conte* was decided in the context of an employment contract case, not a case involving discrimination, such as the case at issue here. Instead, relying on two Supreme Court opinions, *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)(per curiam), the court granted appellee's Motion for Summary Judgment on the grounds that the statute of limitations began to run when appellant was notified that she would be laid off. This appeal followed.

## LEGAL ANALYSIS

## STANDARD OF REVIEW

Summary judgment motions are governed by Md. Rule 2–501(e), which provides that "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." We review the motion and response in a light most favorable to the non-moving party. *Messing v. Bank of America*, 373 Md. 672,

683–84, 821 A.2d 22 (2003). It is not disputed by either party that appellant received a letter on October 8 or 9, 2001, notifying her that she would be terminated as of October 23, 2001. It is also undisputed that appellant left the employment of appellee on that date. When the material facts are not in dispute, we review the trial court's grant of summary judgment to determine if it was legally correct. *Id.* at 684, 821 A.2d 22. The standard of review for a grant of summary judgment on the law is *de novo*. *Id.*

# I

Appellant has asked this Court to conclude that the term "discharge," as that term is used by the Montgomery County Council in Section 27–19 of the Montgomery County Code, means "actual discharge." Appellant claims, in her brief, that the meaning of "discharge" is at the heart of this appeal. More specifically, she contends that

> [the trial judge] found that the limitations period began after the time Dr. Haas was notified of her prospective discharge—October 9, 2001—instead of from the date on which she was actually discharged—October 23 in 2001.

In support of her assignment of error, she contends

> In the instant case, there is no proper construction of the term "discharge" other than "actual discharge or termination of the employment relationship." Had the County Council wished to make the notification of a prospective discharge a discriminatory practice, it might easily have done so. In this case, it did not.... Without question, construing the term "discharge" to mean notification of a discharge that may occur some future time would amount to such a forced interpretation.

If the word "discharge" is determined to mean "actual discharge," as appellant urges, then the statute of limitations period would not begin to run until her employment "actually" ends. In the alternative, if the word "discharge" means "notice of discharge," then the statute of limitations would begin to

run when appellant received the notice that she would be laid off.

Montgomery County Code § 27–19 provides the cause of action authorized by Article 49 § 42(a) and states in pertinent part:

(a) A person must not because of the race, color, religious creed, ancestry, national origin, age, sex, marital status, sexual orientation, family responsibilities, or genetic status of any individual or disability of a qualified individual, or because of any reason that would not have been asserted but for the race, color, religious creed, ancestry, national origin, age, sex, marital status, disability, sexual orientation, family responsibilities, or genetic status:

(1) For an employer:

(A) fail or refuse to hire, fail to accept the services of, discharge any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment; or

(B) limit, segregate, or classify employees in any way that would deprive or tend to affect adversely any individual's employment opportunities or status as an employee ...

(b) The term "discriminate" in subsection (a) includes excluding, or otherwise denying, equal job opportunity or benefits to, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

Although this is a case of first impression for Maryland appellate courts, we are not the first jurisdiction to consider the important question of when the statute of limitations begins to run in an employee's action based upon termination of employment. *See Towson University v. Conte*, 384 Md. 68, 116–21, 862 A.2d 941 (2004) (Eldridge, J., Dissenting). In *Conte*, the Court of Appeals stated that the limitations period in a breach of contract action did not begin to run until the contract was actually breached. *Id.* at 96, 862 A.2d 941. *Conte* involved the breach of an employment contract. *Id.* at 71–72, 862 A.2d 941. In *Conte*, Judge Eldridge maintained in

dissent that the statute of limitations had expired on Conte's claim, relying on two Supreme Court cases, *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981); and *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Id.* at 116–17, 862 A.2d 941. In those cases, the Supreme Court held that the statute of limitations begins to run when the employee is notified of the termination. *Ricks,* 449 U.S. at 258, 101 S.Ct. 498; *Chardon,* 454 U.S. at 8, 102 S.Ct. 28. The *Ricks* and *Chardon* cases involved allegations of discrimination, which led to adverse employment actions. The majority in *Conte,* in response to Judge Eldrige's dissent, held that *"Ricks* and *Chardon* are inapposite to the case at bar. There is no allegation of discrimination or deprivation of civil rights." *Conte,* 384 Md. at 97, 862 A.2d 941. The instant case involves a claim by appellant that she was terminated for a discriminatory purpose. We also note that the language of the Montgomery County Code mirrors the language used in the Federal statute as well as the State statute.[4] Therefore, *Ricks* and *Chardon* are both persuasive authorities in this case.

---

4. 42 U.S.C. § 2000e–2. "Unlawful employment practices"
  (a) Employer practices
  It shall be an unlawful employment practice for an employer—
  (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
  (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
  Md. Ann.Code Art. 49B § 16 "Illegal employment practices" provides, in pertinent part:
  (a) Failure to hire or discharge; reduced status.—It shall be an unlawful employment practice for an employer:
  (1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment, or because of the

*Ricks* involved an allegation that the appellant, Columbus Ricks, was discriminated against when he was denied tenure at Delaware State College. 449 U.S. at 252, 101 S.Ct. 498. As a result of his denial of tenure, Ricks filed a grievance with the College Board of Trustees Educational and Policy Committee. *Id.* The college had a policy of offering junior faculty members, such as Ricks, a one-year terminal contract when they are denied tenure. *Id.* at 253, 101 S.Ct. 498. Prior to the end of the one-year contract, Ricks was notified that his grievance was denied. *Id.* at 254, 101 S.Ct. 498. Ricks filed a complaint in the United States District Court alleging he had been discriminated against. The District Court found that Ricks' claim was barred by the statute of limitations. *Id.* at 254, 101 S.Ct. 498. The Court found the only unlawful employment practice was the college's decision to deny Ricks tenure, and the statute of limitations on that claim began to run at the time he was denied tenure. *Id.* at 254–55, 101 S.Ct. 498. The

---

individual's refusal to submit to a genetic test or make available the results of a genetic test;

(2) To limit, segregate, or classify its employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee, because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment, or because of the individual's refusal to submit to a genetic test or make available the results of a genetic test; or

Md.Code Ann. Art. 49B § 42 "Civil suits for discriminatory acts" authorizes the certain counties to pass legislation allowing a plaintiff to bring a claim in the circuit court and also contains the statute of limitations at issue in this case. Article 49B § 42 states in pertinent part:

(a) Authorized.—In Montgomery County, Prince George's County, and Howard County, in accordance with this subtitle, a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

(b) Limitations periods.—(1) An action under subsection (a) of this section shall be commenced in the circuit court for the county in which the alleged discrimination took place not later than 2 years after the occurrence of the alleged discriminatory act.

Court of Appeals for the Third Circuit reversed the District Court and the Supreme Court granted certiorari. *Id.* at 256, 101 S.Ct. 498.

The Supreme Court concluded that determining the timeliness of a lawsuit requires precise identification of the unlawful employment practice. *Id.* at 257, 101 S.Ct. 498. The Court focused on Ricks' complaint, in which Ricks alleged that discrimination on the part of the college motivated the college to deny him tenure. *Id.* On appeal, Ricks then complained that discrimination not only motivated the college to deny him tenure, but to also terminate his employment. *Id.* The Court determined that Ricks was, in effect, claiming a "continuing violation" of the civil rights laws, such that the statute of limitations would not begin to run until his terminal contract with the College had expired. *Id.* This was clearly at odds with the allegations of Ricks' original complaint. *Id.* Additionally, the Court concluded, the only alleged discrimination occurred at the time the tenure decision was made and communicated to Ricks, and that is when the statute of limitations began to run. *Id.* at 258, 66 L.Ed.2d 431.

Less than a year later, the Supreme Court decided *Chardon*. *Chardon* involved a claim by a group of non-tenured administrators in the Puerto Rico Department of Education that their terminations were in violation of their civil rights. *Chardon*, 454 U.S. at 6, 102 S.Ct. 28. Each of the administrators received a notice from the Puerto Rico Department of Education that his appointment would terminate on a specified date. *Id.* at 7, 102 S.Ct. 28. The Court of Appeals for the First Circuit concluded that the limitations period did not begin running until the appointment ended, rather than from the date of notification. *Id.* In reaching that decision, the Court of Appeals for the First Circuit concluded that *Chardon* was distinguishable from *Ricks* on the ground that the unlawful employment practice in *Ricks* was the denial of tenure. *Id.* In *Chardon*, the administrators complained that termination of their employment was unlawful. *Id.* at 7–8, 102 S.Ct. 28. The Supreme Court reversed the circuit court stating that Ricks

was indistinguishable from Chardon. *Id.* at 8, 102 S.Ct. 28. The Court explained:

> The fact of termination is not itself an illegal act. In *Ricks,* the alleged illegal act was racial discrimination in the tenure decision. [In *Chardon* ], respondents allege that the decision to terminate was made solely for political reasons, violative of First Amendment rights. There were no other allegations, either in *Ricks* or in [*Chardon* ], of illegal acts subsequent to the date on which the decisions to terminate were made.

*Id.* at 8, 102 S.Ct. 28 (internal citations omitted). The Court's decisions in *Ricks* and *Chardon* rest on the principle that the date which begins the running of the statute of limitations should bear some genuine relationship to the alleged illegal act.

As we stated *supra,* many jurisdictions have followed the Supreme Court's decision in *Ricks* and *Chardon,* but a few jurisdictions have declined to follow those cases, instead opting for a more bright line rule. In *Romano v. Rockwell International, Inc.,* 14 Cal.4th 479, 495, 59 Cal.Rptr.2d 20, 926 P.2d 1114, 1124 (1996), the Supreme Court of California concluded that the statute of limitations commences to run under FEHA[5] on the date of actual termination. In reaching that conclusion, the California Supreme Court determined that the usual and customary meaning of the term "discharge," in the employment context, is to terminate. *Id.* at 493, 59 Cal. Rptr.2d 20, 926 P.2d at 1122. This definition, the court said, "is consistent with the plain meaning of the statutory language." *Id.*

Additionally, the court identified several policy reasons for reaching the above conclusion:

> Determining the limitations period does not begin to run has the benefit of simplicity, in that the date of actual termination in most cases is subject to little dispute, where-

---

**5.** FEHA is the California Fair Employment and Housing Act, which the appellant in *Rockwell* alleged the employer violated when he was terminated. 14 Cal.4th at 491–92, 59 Cal.Rptr.2d 20, 926 P.2d at 1121.

as the notification frequently is oral and may be conditional or equivocal. *Id.* at 494, 59 Cal.Rptr.2d 20, 926 P.2d at 1123. Holding that the statute of limitations begins to run from the time of notification of termination would promote premature and potentially destructive claims, requiring employees to seek a remedy for harm that had not yet occurred. *Id.* If employees are required to file claims once they receive notice of termination, that would reduce any chance of conciliation between the parties. *Id.* Courts would be required to prematurely adjudicate claims. *Id.* at 495, 59 Cal.Rptr.2d 20, 926 P.2d at 1123.

The court found further support for the position that the limitations period does not begin to run until the date of actual termination in other jurisdictions.[6] *Id.* at 494–95, 59 Cal. Rptr.2d 20, 926 P.2d 1114, 926 P.2d at 122–24. In *Ross,* 76 Hawai'i at 461, 879 P.2d at 1044, the Supreme Court of Hawai'i held that, in an action for unlawful discharge, the time for filing a complaint begins to run "on the date the employee is actually discharged, that is on the date that his or her employment terminates." 76 Hawai'i at 461, 879 P.2d at 1044. In reaching its decision, the Court said:

A bright line rule that the filing period commences on the date of actual discharge fairly accommodates the interest of both employees and employers .... such a rule favors adjudication on the merits.... [M]any, if not most, employees become aware of and begin to pursue legal remedies for unlawful discharge only after they have actually been dismissed.... Our reading of [the statute] does not mean that employers will be forced to defend against large numbers of "stale" claims.... [B]ecause an employer would know—and, presumably, control—when it notified an employee of his or her impending discharge, nothing would prevent it from

---

**6.** *See Ross v. Stouffer Hotel Company (Hawai'i) Ltd.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994); *Allison v. Jumping Horse Ranch, Inc.,* 255 Mont. 410, 843 P.2d 753, 756 (1992). *Keelan v. Bell Communications Research,* 289 N.J.Super. 531, 674 A.2d 603, 606–07 (1996); *Harris v. Home Sav. and Loan Ass'n,* 663 So.2d 92, 94 (La.Ct.App.1995); *Janikowski v. Bendix Corp.,* 823 F.2d 945, 949 (6th Cir.1987).

taking steps to protect against the problem normally associated with stale claims.

*Id.* at 461–62, 879 P.2d at 1044–45.

## II

Our preceding review of pertinent authority illustrates that there is division among courts as to the proper time for the statute of limitations period to begin to run in employment discrimination cases. Maryland case law has relied on decisions interpreting the language of Title VII when faced with the task of interpreting a similar provision of Article 49B. *See University of Maryland at Baltimore v. Boyd,* 93 Md.App. 303, 311, 612 A.2d 305 (1992) (Recognizing that Article 49B is "modeled on Title VII of the Civil Rights Act of 1964 . . . .," citing *Burnett v. Grattan,* 468 U.S. 42, 51, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984), we relied on Title VII case law to determine the standard for a claim of disparate impact); *Pope–Payton v. Realty Management Services, Inc.,* 149 Md. App. 393, 402 n. 6, 815 A.2d 919 (2003) (Because Article 49B is modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq., we may look to federal case law interpreting Title VII in analyzing claims under Article 49B. (internal citations omitted)); *State of Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 280 Md. 35, 40–43, 371 A.2d 645 (1977)(Relying on the Federal Civil Rights law to interpret Article 49B § 18, where the Court found the Maryland law to be virtually identical to the federal law).

As we stated *supra,* the language of the statutes is similar. In fact, Montgomery County Code § 27–1(b) provides, "The prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law." What distinguishes § 27–1(b) is that the Montgomery County Council intended to "assure that a complaint filed under this article may proceed more promptly than possible under either federal or state law." *Id.* We think it appropriate to rely on federal case law to interpret similar language in the Montgom-

ery County Code, which has language that tracks both the federal and Maryland employment discrimination laws.

As we previously discussed, the federal case law is unequivocal that the proper focus, in cases of discrimination leading to the termination of employment, is on the time of the discriminatory act.[7] *Chardon*, 454 U.S. at 8, 102 S.Ct. 28. *Chardon* is particularly on point in this case because appellant is claiming her termination was the discriminatory act, which is exactly what the appellant in *Chardon* claimed. *Id.* at 7–8, 102 S.Ct. 28. The Court in *Chardon* made clear that the "fact of termination is not itself an illegal act:"

> In *Ricks*, we held that the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful. 449 U.S. at 258, 101 S.Ct. at 504. The act of termination is not itself an illegal act. In *Ricks*, the alleged illegal act was racial discrimination in the tenure decision. *Id.* at 259, 101 S.Ct. at 504. Here, respondents allege that the decision to terminate was made solely for political reasons, violative of First Amendment rights. There were no other allegations, either in *Ricks* or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made. As we noted in *Ricks*, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257, 101 S.Ct. at 504. In the cases

---

7. Members of the panel, at oral argument before this Court, pointed out to appellate counsel for Haas that paragraph 59 of her "COMPLAINT FOR DISABILITY DISCRIMINATION AND DEMAND FOR JURY TRIAL" reads: "Phelan's explanation was pretextual and was contrived solely for the purpose of providing Phelan with a 'basis' to terminate Haas." The pretextual explanation to which appellant refers is contained in Paragraph 40 of the Complaint: "On June 11, 2001, Phelan surprised Haas by sending to her a letter criticizing her for, *inter alia*, having a laptop computer stolen and in failing to follow up on an assignment. Phelan attributed the stolen laptop, *inter alia*, [sic] Haas' alleged failure to follow company policies and Haas' alleged problems with attention to detail." Phelan also accused Haas of not properly backing up the work on her laptop before it was stolen. The averment in paragraph 59, culminating in notice to appellant, contains the essence of the discriminatory act of which appellant complains.

at bar, respondents were notified, when they received their letters, that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suit must be filed.

*Id.* at 8, 102 S.Ct. 28.

Appellant, like the plaintiffs in *Chardon,* have not alleged any discriminatory act following the time when she received notice that she would be laid off which, in this case, coincides with appellee's decision not to hire appellant in the new position. As the Court said in *Ricks,* "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." 449 U.S. at 257, 101 S.Ct. at 504. We therefore hold that the statute of limitations on a claim of employment discrimination under the Montgomery County Code begins to run when notice of termination is received.

Appellant has urged this Court to engage in statutory interpretation, reaching the same conclusion as some state courts as discussed, *supra.*[8] We decline to do so. Instead, we

---

8. Appellant contends "... there is no proper construction of the term 'discharge' other than 'actual discharge or termination of the employment relationship.'" What appellant overlooks is that the unlawful discharge of any individual under § 27–19 of the Montgomery County Code is only one of the prohibited acts. Any statutory construction, applying the principles espoused in *Ricks* and *Chardon,* would require us to look at appellant's complaint in which he sets forth the discriminatory acts he alleged to be the pretextural criticisms and admonishments. Appellant claims appellee's employees resorted to these pretexts in order that they might justify their decision to terminate her. Under subsection A of § 27–19, in addition to wrongful termination, employers are prohibited from "otherwise discriminat[ing] against any individual, with respect to compensation, terms, conditions, all privileges of employment." Moreover, "discrimination" is defined under subsection (b) as the denial of "equal job opportunity or benefits to a qualified individual because of the known disability of an individual ..." Although appellant, in this appeal, seeks to focus only on her discharge, the Montgomery County Code, by its very language, proscribes discriminatory acts in broader terms. Thus, construction of the pertinent provisions in the Montgomery County Code supports the principle that, under proper circumstances, we look to the discriminatory act, rather than the date of discharge.

rely on federal cases which have interpreted similar language in the federal statutes. This has been the practice of the Court where the language in the statute is similar to federal law, as it is here.

Appellant has also argued that construing the limitations period as commencing on the date of actual discharge is consistent with the remedial purpose of the discrimination laws, *i.e.*, confusion will be eliminated and the probability that these cases are heard on the merits will be enhanced. We find these arguments unpersuasive. The remedial purpose of the statute is no less served by beginning the running of the limitations period when the individual receives notice of a discriminatory employment action, particularly, when the statute of limitations period is two years—rather than a shorter period—as it is under Article 49B. Because we have determined that notice of her impending layoff began the running of the statute of limitations in this case, we decline to reach appellant's final argument.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**