914 A.2d 735

**Suzanne HAAS**

v.

**LOCKHEED MARTIN CORPORATION.**

No. 5, Sept. Term, 2006.

Court of Appeals of Maryland.

Jan. 9, 2007.

470

472

Laurence S. Kaye (The Kaye Law Firm of Gaithersburg, MD, Julie Glass Martin–Korb of Rockville, MD), all on brief, for Petitioner.

Brief of amici curiae the Public Justice Center and the Maryland Employment Lawyers Association.

Roscoe Jones, Jr., Esquire, Francis D. Murnaghan, Jr., Appellate Advocacy Fellow, Suzanne Sangree, Esquire, Stephen Ruckman, Esquire, Public Justice Center, Baltimore, MD, for amicus curiae Public Justice Center.

Deborah Thompson Eisenberg, Esquire, Brown, Goldstein & Levy, Baltimore, MD, for amicus curiae Maryland Employment Lawyers Association.

Michael J. Murphy (John B. Flood of Ogletree, Deakins, Nash, Smoak & Stewart, P.C. of Washington, D.C.), on brief for Respondent.

Robin S. Conrad, Esquire, Shane Brennan, Esquire, National Chamber Litigation Center, Inc., Washington, D.C., for Respondent.

Maurice Baskin, Esquire, Venable L.L.P., Washinton, D.C., for Respondent.

Argued Before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We issued a writ of certiorari in this case, 393 Md. 160, 900 A.2d 206 (2006), to consider a matter of first impression in the reported opinions of the appellate courts of this State: what circumstances should be looked to in determining the point of

accrual for a cause of action claiming discriminatory discharge under Maryland Code (1957, 1998 Repl.Vol.), § 42 of Article 49B. In addressing this query, we are required to determine, in the context of discriminatory discharge cases filed pursuant to Montgomery County, Md., Code § 27–19, whether the *"occurrence* of the alleged discriminatory act" means (1) the notification of an employee's impending discharge, or (2) the actual cessation of an employee's employment. Md.Code, Art. 49B, § 42(b) (emphasis added).

## I. FACTS[1]

In October 1998, Petitioner Suzanne Haas was hired as a Program Administrator in the Lockheed Martin Corporation's Mission Systems division. At the time of her hiring, she possessed a Master's degree and was near completion of her Doctorate, lacking only a finished dissertation. From the date of hiring until October 1999, Haas worked under the supervision of Katie Sterrett, who gave Haas largely positive formal, as well as informal, performance reviews. By all accounts, Haas initially achieved the level of performance expected of new employees. In June 1999, however, Sterrett noted, and Haas acknowledged, a problem with Haas's attention to details. This difficulty persisted for several months and, in January 2000, Haas sought a psychiatric evaluation of the situation. Tests yielded a diagnosis of Attention Deficit Disorder ("ADD") and learning disabilities, both of which were to be treated with medication. Several months later, Haas informed her new supervisor, Amy Lowenstein, of the diagnosis and assured her that the medication was alleviating the adverse symptoms of her condition. In June 2000, Lowenstein completed an annual personnel review, called a "Contribution

---

1. The facts supplied in this opinion are either undisputed or, where the context indicates, assumed to be true solely for purposes of our analysis where summary judgment was granted against the non-moving party, Haas in this case. *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520, 529 (2006) (citing *Livesay v. Baltimore,* 384 Md. 1, 10, 862 A.2d 33, 38 (2004)).

Assessment", of Haas's performance at Lockheed. The conclusion classified Haas as a "contributor" to the company.[2]

In May or April 2000, as part of a structural reorganization at Lockheed, Haas began dividing her work time between her Missions Systems position and a new post in the consolidated human resources unit called Corporate Shared Services. In this role, Haas reported to a supervisor in the Learning Services unit of Corporate Shared Services, Candice Phelan, who also was aware of Haas's medical condition. Haas and Phelan exchanged correspondence where Haas clarified that her medical condition would have no adverse effect on her work and Phelan expressed her confidence in their future working relationship. Nonetheless, a conflict arose shortly after Haas began assuming more responsibilities under the supervision of Phelan.

Petitioner, in her later filed complaint, alleged a number of instances where Phelan exhibited a general disapproval of Haas's work and assertedly made undue and frequent criticisms of her performance. Among these instances were claims that Phelan consistently suggested that Haas should not be assigned tasks involving writing, mathematical calculations, exercise of judgment, computers, or attention to detail. Petitioner also alleged that Phelan told Petitioner that she should consider a teaching career, as opposed to remaining at Lockheed Martin. Phelan purportedly went so far as to forward to Haas, unsolicited, a job posting from outside the company. Petitioner assigned a malevolent motive to the remarks and actions of Phelan, in contrast to the praise she apparently received from customers and others who encountered her work. Reprimands from Phelan continued for what

---

2. Haas also received a "contributor" rating in her first Contribution Assessment by her former supervisor, Sterrett. The Contribution Assessment process provides an overall rating of employees on a 1–5 scale (1 being the highest performance), with "contributor" representing a 3 on that scale. The two inferior ratings of "marginal contributor" and "unsatisfactory" entail disciplinary action for the failure to meet the employer's expectations. The two superior ratings, "superior contributor" and "high contributor", are characterized by the employee consistently exceeding his or her job standards.

Haas described as various minor deficiencies in Haas's performance, such as spelling errors in written work that allegedly passed without criticism when committed similarly by other employees.

In April 2001, Phelan informed Haas that the functions Haas performed at Learning Services were to be transferred to the company's Institute for Leadership Excellence ("ILE") at some time in the near future. On 10 April 2001, the Director of the ILE, Dorothea Mahan, posted on the company's Career Network website link a notice for an opening for a staff position dedicated, *inter alia*, to the logistical and planning functions previously performed by Haas for Learning Services. Haas applied for this position, but neither was selected for an interview nor offered the position. Mahan explained, in a deposition taken following the filing of Haas's complaint, that, in her view, Haas lacked the requisite experience in event planning to serve the needs of the position. It is uncertain exactly when Haas was informed that her application was unsuccessful,[3] but it suffices to say that she was not aware that she had not been selected for the ILE position until shortly before she received a notification of layoff.

On 11 June 2001, Phelan placed Haas on a Performance Improvement Plan ("PIP"), a type of formal discipline apparently meant to direct the improvement of the disciplined employee's performance. Phelan dispatched a memorandum to Haas confirming the topics discussed at a meeting between the two to review the PIP, including Phelan's perceptions of Haas's shortcomings in judgment, planning, and attention to detail. Also part of the PIP discussion was a reference to the theft of a laptop under Haas's control while at a business meeting. The PIP memorandum indicated that a failure to correct the issues highlighted therein might subject Haas to

---

**3.** A notation made in the records of the Lockheed Martin Training and Development Department for the ILE staff position indicated that the decision to reject Haas's application was made on 17 September 2001. Haas, however, does not appear to have been notified of that decision at that time. Haas apparently became aware of the rejection of her application on 8 October 2001.

further disciplinary action, including dismissal. Petitioner disputed the accuracy of various issues raised in the PIP when it was issued, as echoed in her complaint, along with the contention that, with regard to the laptop theft, she was disciplined more severely than other employees in similar situations. Petitioner further stated in her complaint that Phelan's issuance of the PIP and its contents were merely subtexts to harm Petitioner's standing at the company and simultaneously disqualify her from any possible promotions, transfers, or other opportunities at Lockheed.[4] Nonetheless, Phelan dispatched a memorandum to Haas on 24 September 2001 indicating that the relevant aspects of her performance had improved sufficiently and, as a result, she was being taken off the PIP.

On 28 June 2001, Phelan completed an annual Contribution Assessment of Haas, in which she rated Haas as a "marginal contributor." Although Phelan indicated that she was impressed with several of Petitioner's "very positive attributes", she stated that Petitioner exhibited below-standard performances in judgment, compliance with company policy, attention to detail, and planning. Petitioner, at the time, disputed the reliability of her lower rating because she believed that Phelan had not taken into account positive feedback from two customers she serviced.

Phelan composed a memorandum to Haas, dated 9 October 2001, with the subject line "Notification of Layoff," indicating that Haas's position was to be eliminated effective 23 October 2001. The text of the memorandum made reference to the layoff as a "Reduction in Force". It also contained a description of the company's severance benefit plan, a contact with "outplacement services", and a request to complete an exit interview prior to Haas's last day of work.

Haas, pointing to her supervisors' alleged reactions to her diagnosed ADD, filed a Complaint in the Circuit Court for

---

4.  Petitioner states that Lockheed Martin policy prevents any employee currently the subject of a PIP from being considered for any promotions or transfers.

Montgomery County on 22 October 2003 alleging, under Montgomery County Code § 27–19, disability discrimination in Lockheed's termination of her employment. Lockheed responded with a Motion to Dismiss, filed on 25 November 2003, contending that the Complaint failed to state a claim upon which relief could be granted and raising certain constitutional issues, the latter of which are not relevant to this Court in the posture the case reaches us. As a result of Lockheed's arguments challenging the constitutionality of § 27–19, Montgomery County, Maryland, moved to intervene, which was allowed, and opposed Lockheed's motion.[5] The Circuit Court, after a hearing, denied the Motion to Dismiss. Following discovery, on 1 November 2004, Lockheed filed a Motion for Summary Judgment which Haas opposed.

Lockheed's posited in its summary judgment motion that Haas's claim was time-barred in the first instance because it accrued upon notice of her layoff, rather than upon her final day of work. Maryland Code, Article 49B, § 42(b)(1) provides: "An action under [the relevant local anti-discrimination ordinance] shall be commenced in the circuit court for the county in which the alleged discrimination took place not later than 2 years after the occurrence of the alleged discriminatory act." Lockheed also contended that Haas had not proven in her complaint that she was improperly "regarded as" being disabled by her supervisors under Montgomery County Code § 27–6 and additionally that the acts challenged as discriminatory were legitimate business acts. Haas responded in her opposition that the relevant statute of limitations only began to run upon her final day of employment. She also submitted that the issues of her being regarded as disabled, and whether she was discriminated against on that basis, were material facts in dispute, which could not be resolved on summary judgment. After a hearing, the Circuit Court granted summary judgment to Lockheed upon the statute of limitations ground. Haas filed a timely appeal to the Court of Special Appeals, which affirmed the judgment of the Circuit Court in

---

5. Montgomery County did not participate in the proceedings before us.

a reported opinion. *Haas v. Lockheed Martin Corp.*, 166 Md.App. 163, 887 A.2d 673 (2005). Haas petitioned this Court for a writ of certiorari, which we granted.

## II. ANALYSIS

### A. Standard of Review of the Grant of Summary Judgment

■ This case requires us to review the Circuit Court's grant of summary judgment in favor of Respondent Lockheed Martin. We consider, *de novo*, first, whether a material fact was placed in genuine dispute, thus requiring a trial, and, second, if trial by a fact-finder is not required, whether the Circuit Court was legally correct in granting summary judgment. *Livesay v. Baltimore County*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004) (citing *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98, 105 (2004)).

■ The standard for reviewing the grant of summary judgment is well-settled in Maryland:

Maryland Rule 2–501 indicates that a motion for summary judgment is appropriate 'on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.' A motion for summary judgment may be supported by affidavit. When reviewing the grant or denial of a motion for summary judgment we must determine whether a material factual issue exists, and all inferences are resolved against the moving party. '[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' The function of a summary judgment proceeding is not to try the case or to attempt to resolve factual disputes but to determine whether there is a dispute as to material facts sufficient to provide an issue to be tried. A 'material fact' is one which will somehow affect the outcome of the case.

An appellate court reviewing a summary judgment examines the same information from the record and determines

the same issues of law as the trial court. We are often concerned with whether a dispute of material fact exists when reviewing the grant of a summary judgment motion. We recently reiterated the standard of review for a trial court's grant or denial of a motion for summary judgment in *Myers v. Kayhoe*, 391 Md. 188, 892 A.2d 520 (2006):

'The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. *Livesay v. Baltimore*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In reviewing a grant of summary judgment under Md. Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Id.* at 9–10, 862 A.2d at 38. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.' *Id.* at 10, 862 A.2d at 38.

*Id.* at 203, 892 A.2d at 529.

*United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 65–67, 899 A.2d 819, 825–826 (2006) (some internal citations omitted).

There are no material facts in genuine dispute here bearing on the legal ground upon which summary judgment was granted. The parties agree that, on 9 October 2001, Petitioner was issued a written notification of her layoff, which was to become effective on 23 October 2001. Petitioner's employment at Lockheed ceased on 23 October 2001. Therefore, we shall consider whether the grant of summary judgment by the Circuit Court in favor of Lockheed Martin based on the applicable statute of limitations, was correct as a matter o f law. *Livesay*, 384 Md. at 9, 862 A.2d at 38.

### B. The Date of Accrual for Wrongful Discharge and the *Ricks/Chardon* Rule

Section 42 of Maryland Code (1957, 1998 Repl.Vol.), Article 49B authorizes individuals in Prince George's, Montgomery, and Howard Counties to pursue private, civil claims of discrimination, pursuant to the provisions of the respective

county codes, and seek both damages and injunctive relief. The provision of the Montgomery County Code relevant here makes it unlawful for an employer to "discharge any individual" on the basis of the "disability of a qualified individual." [6] The County Code defines "disability" not only in terms of an actual "physical or mental impairment that substantially limits one or more of an individual's major life activities", but also "being regarded as having such an impairment." Montgomery County, Md., Code § 27-6. Petitioner has staked her claim on the notion that her supervisors at Lockheed mistakenly regarded her as being disabled. No contention is advanced here that Petitioner is not entitled to the protection afforded by County Code § 27-19 and we assume, *arguendo*, that she is so entitled.[7] A private, civil action brought under this regulatory scheme must be filed within two years of the "occurrence of the alleged discriminatory act." Md.Code, Art. 49B, § 42(b).

The Circuit Court granted, and the Court of Special Appeals affirmed, summary judgment for Lockheed on the ground that Petitioner's cause of action for discrimination was time-barred by the statute of limitations imposed by Maryland Code, § 42(b) of Article 49B. Essentially, as the reasoning of the Circuit Court went, Haas's cause of action accrued no later

---

**6.** Sec. 27-19. Discriminatory employment practices.

(a) A person must not because of the race, color, religious creed, ancestry, national origin, age, sex, marital status, sexual orientation, family responsibilities, or genetic status of any individual or *disability of a qualified individual,* or because of any reason that would not have been asserted but for the race, color, religious creed, ancestry, national origin, age, sex, marital status, *disability,* sexual orientation, family responsibilities, or genetic status:

(1) For an employer:

(A) fail or refuse to hire, fail to accept the services of, *discharge any individual,* or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment. . . .

(emphasis added).

**7.** Petitioner and Respondent do not raise, and thus we do not consider here, the issue of any disputed facts not material to the legal ground upon which summary judgment was granted, i.e. the statute of limitations.

than on 9 October 2001, the date she received Phelan's layoff memorandum, thus requiring the initiation of suit by no later than 9 October 2003. Having filed her Complaint on 22 October 2003, Haas's claim was time-barred. The trial court and the intermediate appellate court both found persuasive on this question the decisions of the United States Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), reasoning that the term "discharge", as used in § 27–19 of the County Code, meant the notification of discharge from employment, as opposed to the date of the complete cessation of employment.

While both of these cases, one of which construes the provisions of Title VII of the Civil Rights Act of 1964,[8] are relevant authorities because our courts traditionally seek guidance from federal cases in interpreting Maryland's Article 49B,[9] they do not bind us here.[10] In *Ricks*, Columbus Ricks, a

---

**8.** 42 U.S.C. § 2000 *et seq.* (2000), *construed in Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Title VII is the federal analog to Art. 49B of the Maryland Code. Specifically, § 2000e–2 provides:

§ 2000e–2. Unlawful employment practices

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to *discharge any individual,* or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

(emphasis added). While Title VII does not include the disabled within its express protection, the statute's similarity to Article 49B in its general prohibition of discrimination in the employment context provides a useful comparison.

**9.** *Molesworth v. Brandon,* 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989); *Pope–Payton v. Realty Mgmt. Servs., Inc.,* 149 Md.App. 393, 402 n. 6, 815 A.2d 919, 924 n. 6 (2003); *Comm'n on Human Relations v. Suburban Hosp., Inc.,* 113 Md.App. 62, 86, 686 A.2d 706, 718 (1996), *vacated on other grounds,* 348 Md. 413, 704 A.2d 445 (1998).

**10.** Maryland appellate courts have interpreted state statutes, rules, and constitutional provisions differently than analogous federal provisions

on numerous occasions, even where the state provision is modeled after its federal counterpart.

Maryland courts sometimes prefer interpretations of state statutes varying from similar federal statutes, as exemplified by *Carroll v. Housing Opportunities Commission*, 306 Md. 515, 523, 510 A.2d 540, 544 (1986) (" 'A large body of decisional law has been developed in the federal courts interpreting the federal standard [for determining a statutorily set amount in controversy], which, while not binding, is a logical reference.' " (quoting *Pollokoff v. Md. Nat'l Bank*, 288 Md. 485, 491, 418 A.2d 1201, 1205 (1980))), *Quality Discount Tires, Incorporated v. Firestone Tire and Rubber Company*, 282 Md. 7, 12, 14–23, 382 A.2d 867, 870, 871–876 (1978) (holding that the a principle enunciated by the Supreme Court as to the Sherman Act did not preclude plaintiff's suit under the Maryland Antitrust Act), and *State v. Bailey*, 289 Md. 143, 151–52, 422 A.2d 1021, 1026 (1980) (addressing the possibility of differing standards for wiretaps under similar state and federal statutes).

For examples of divergent rule constructions, see *Stoddard v. State*, 389 Md. 681, 695–96, 887 A.2d 564, 572 (2005), *Pinkney v. State*, 350 Md. 201, 235, 711 A.2d 205, 222 (1998) (noting the Supreme Court's interpretation of a rule governing *in absentia* trials is not binding on Maryland courts for a similar rule), *State v. Matusky*, 343 Md. 467, 490, 682 A.2d 694, 705 (1996) (acknowledging that the Supreme Court's interpretation of the federal statement against penal interest hearsay exception, while persuasive, is not binding on the states), and *Walker v. State*, 338 Md. 253, 260, 658 A.2d 239, 242 (1995) (dealing with rules for *in absentia* trials).

For cases addressing the notion that state constitutional provisions, even when read *in pari materia* with federal dopplegangers, may be interpreted differently from those counterpart federal provisions, see *Dua v. Comcast Cable of Maryland, Incorporated*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) (cataloguing cases) and *Aero Motors, Incorporated v. Motor Vehicle Administration*, 274 Md. 567, 587, 337 A.2d 685, 699 (1975) ("Although Art. [24] of the Maryland Declaration of Rights has long 'been equated' with the 'due process' clause of the Fourteenth Amendment by judicial construction and application, the two provisions are not synonymous."); *see also Borchardt v. State*, 367 Md. 91, 175, 786 A.2d 631, 681 (2001) (Raker, J., dissenting) ("Although this Court has generally interpreted Article 24 in pari materia with the Due Process Clause of the Fourteenth Amendment, we have interpreted it more broadly in instances where fundamental fairness demanded that we do so."). Judge Raker's dissent in *Borchardt* cited some examples in the criminal context, such as placing stricter limits on prosecutorial discretion to enter nolle prosequi and the optional merger of criminal offenses. *Id.* We have also read Maryland's due process clause more broadly than the federal constitution in granting the right to counsel, *see Rutherford v. Rutherford*, 296 Md. 347, 358, 363, 464 A.2d 228, 234, 237 (1983), *cited in Das v. Das*, 133 Md.App. 1, 28, 754 A.2d 441, 456 (2000), and the protection from self-incrimination, *Choi v. State*, 316 Md. 529, 535 n. 3, 560 A.2d 1108, 1111 n. 3 (1989).

black Liberian professor at Delaware State College, alleged that the College discriminated against him on the basis of his national origin when he was denied tenure after serving several years on the faculty. 449 U.S. at 252, 101 S.Ct. at 501. After the Board of Trustees formally voted against tenure for Ricks following a reconsideration by the Faculty Committee on Promotions and Tenure, Ricks pursued an internal grievance process through the Board's Educational Policy Committee. *Id.* While this grievance was pending, the College followed its policies regarding the termination of non-tenured junior faculty members, which included an offer of a one-year "terminal" contract. *Ricks,* 449 U.S. at 252–53, 101 S.Ct. at 501. Ricks signed the contract and, within eight days thereafter, the Board of Trustees informed Ricks that his grievance was denied. *Ricks,* 449 U.S. at 253–54, 101 S.Ct. at 501–02.

After the Equal Employment Opportunity Commission (EEOC) issued a "right to sue" letter to Ricks, he filed suit in federal District Court alleging that he had been the subject of discrimination. *Ricks,* 449 U.S. at 254, 101 S.Ct. at 502. The District Court dismissed the action as untimely for the reason that the applicable statute of limitations of 180 days became engaged on the day the College offered Ricks the terminal one-year contract and therefore Ricks failed to file his EEOC complaint before the expiration of the relevant limitations period. *Ricks,* 449 U.S. at 254–55, 101 S.Ct. at 502. The U.S. Court of Appeals for the Third Circuit reversed, holding that Ricks's cause of action accrued upon the expiration of his terminal contract, rather than on its offer. *Ricks,* 449 U.S. at 255, 101 S.Ct. at 503. The Third Circuit relied heavily on public policy reasoning that to require litigation to commence contemporaneously with the employee's last days on the job would reduce productivity and confound conciliation attempts in light of the possibility that the initial decision to terminate may be reversed before it became effectuated. *Ricks,* 449

---

Put in a more homespun idiom, and paraphrasing a frequent motherly admonition, "Just because [Georgia] ran off a cliff doesn't mean [Maryland] has to follow suit."

U.S. at 255–56, 101 S.Ct. at 503. The Third Circuit extolled the benefits of a bright-line rule based on the final day of work as a better guide for both employees and courts regarding the triggering of limitations. *Ricks,* 449 U.S. at 256, 101 S.Ct. at 503.

The Supreme Court reversed the Third Circuit, holding that the limitations period commenced upon the College's notification to Ricks that he was denied tenure and offered a terminal contract. *Ricks,* 449 U.S. at 261–62, 101 S.Ct. at 506. The Court analyzed the timeliness issue by first identifying "precisely the 'unlawful employment practice' of which [Ricks] complains," based on the allegations contained in Ricks's complaint. *Ricks,* 449 U.S. at 257, 101 S.Ct. at 503–04. Finding in Ricks's complaint that he had not alleged any discriminatory acts through the time of his actual discharge, the Court opined that he could not breathe new life into his complaint for denial of tenure by arguing later that his discharge was also discriminatory. *Id.* (citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)) ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."). The Court, in its analysis, hewed to the acts of discrimination alleged in the complaint, notwithstanding when the effects of those acts are manifested. *Ricks,* 449 U.S. at 258, 101 S.Ct. at 504 ("The proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts become most painful." (quoting *Abramson v. Univ. of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979))). Because Ricks failed to allege that "the manner in which h is employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure," the only discriminatory act for the Court to consider was the denial of tenure. *Id.* The Court noted that the result reached in *Ricks* was dictated by the particular facts in that case and that the "widely varying circumstances" of other discriminatory discharge cases require that the principles discussed in *Ricks* be applied on a case-by-case basis. *Id.* at n. 9.

Less than one year after *Ricks*, the Supreme Court granted certiorari in another tenure denial case, *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6. In *Chardon*, several non-tenured administrators in the Puerto Rico Department of Education were notified by letter that their appointments would conclude within a certain time frame. 454 U.S. at 6–7, 102 S.Ct. at 28. One employee contested the legality of the termination by filing a lawsuit, which was dismissed by a federal District Court as time-barred, premised on the reasoning that the cause of action accrued upon the receipt of the termination notification letters. *Chardon*, 454 U.S. at 7, 102 S.Ct. at 28. The U.S. Court of Appeals for the First Circuit reversed the District Court, holding that the accrual date was the actual day that the appointments ended. *Chardon*, 454 U.S. at 6, 102 S.Ct. at 29. The Supreme Court, in turn, reversed the First Circuit stating that its decision was contrary to the holding in *Ricks*, which could not be distinguished from *Chardon*, 454 U.S. at 7–8, 102 S.Ct. at 29. Specifically, the Court noted that "in each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated." *Chardon*, 454 U.S. at 8, 102 S.Ct. at 29. Because the administrators in *Chardon* did not allege any discriminatory acts following the decision to terminate their appointments, the Court held that the limitations period on their claims commenced on the date they were notified of their impending terminations. *Id.*

As Petitioner and Respondent in the present case demonstrated in their briefs and at oral argument, there exists a split across jurisdictions as to the acceptance of the eponymous "*Ricks/Chardon* rule".[11] It appears that the majority of

---

11. Following oral argument in this Court on 7 September 2006, Respondent requested by letter that we take judicial notice of the content of a letter, dated 3 September 2006, from Mr. Michael Dennis, the Compliance Director of the Montgomery County Office of Human Rights, purporting to state that the Office administratively follows the *Ricks/Chardon* rule in its calculus of the statute of limitations for employment discrimination complaints. Petitioner, not surprisingly, opposed the request.

states [12] have adopted this rule in discriminatory discharge cases.[13] There are, however, a number of states that rejected

---

Maryland Rule 5–201, which governs judicial notice of adjudicative facts, provides that "[j]udicial notice may be taken at any stage of the proceeding." Rule 5–201(f). Respondent requests that we view the letter as establishing a fact that is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 5–201(b).

The letter proffered by Respondent neither is the type of source nor are its contents the type of facts we may recognize for judicial notice purposes under the Rule. The content of the letter composed by Mr. Dennis is not based on a statute, ordinance, or regulation. What is more, even if it could be viewed as some manner of policy statement by the Office of Human Rights, it does not convey a previously published policy, that is, one capable of reliably accurate and ready determination. We have refused to notice judicially the unwritten, unpublished policies of various divisions of government in this State. *See, e.g., Cook v. Sherry,* 268 Md. 26, 30–31, 299 A.2d 811, 813–14 (1973) (declining to take judicial notice of the City of Cumberland Police Department's " 'unwritten policy' of having all promotions made on a probationary basis for one year following the date of appointment"); *Anne Arundel County v. Cushman,* 255 Md. 153, 161–62, 257 A.2d 150, 154–55 (1969) (holding that a county's release of proposal and specifications for waste collection contracts did not qualify as a published statute or ordinance for judicial notice purposes); *accord Powell v. State Farm Mut. Auto. Ins. Co.,* 173 S.W.3d 685, 689–90 (Mo.Ct.App.2005); *Dep't of Human Resources v. Haggard,* 173 Ga.App. 676, 327 S.E.2d 798, 799–800 (1985).

Accordingly, we deny Respondent's request.

**12.** We are concerned primarily with the decisions of state appellate courts in adopting or rejecting the *Ricks/Chardon* rule because the rule, crafted by the U.S. Supreme Court, clearly is binding on federal courts. Thus, cataloguing federal circuits that follow the rule, applying it to different statutory schemes, is of no moment here. *See, e.g., Stephenson v. Am. Dental Ass'n,* 789 A.2d 1248, 1250–51 (D.C.2002).

**13.** *Vollemans v. Town of Wallingford,* 2006 WL 224435, at *4–5 (Conn.Super.Ct.2006) (unpublished decision); *Allen v. Lieberman,* 359 Ill.App.3d 1170, 296 Ill.Dec. 649, 836 N.E.2d 64, 70 (2005); *Keene v. Marion County Superior Ct.,* 823 N.E.2d 1216, 1218 (Ind.Ct.App.2005), *vacated on other grounds,* 849 N.E.2d 1141, 1142 (Ind.2006); *Eastin v. Entergy Corp.,* 865 So.2d 49, 53–54 (La.2004); *Stephenson,* 789 A.2d at 1251–52 (D.C.2002); *Specialty Retailers, Inc. v. DeMoranville,* 933 S.W.2d 490, 492–93 (Tex.1996); *Weber v. Moses,* 938 S.W.2d 387, 393 (Tenn.1996); *Wagher v. Guy's Foods, Inc.,* 256 Kan. 300, 885 P.2d 1197, 1204–05 (1994) (discrimination in hiring case); *Wheatley v. Am. Tel. & Tel. Co.,* 418 Mass. 394, 636 N.E.2d 265, 268–69 (1994) (finding facts in *Ricks* inapposite, but holding that date of unequivocal notice marks

the *Ricks/Chardon* rule in favor of the approach that considers, in applying a limitations period to a discrimination claim, a discharge to have occurred upon the actual cessation of employment.[14]  Of the states that adopted *Ricks/Chardon* and held that a discriminatory discharge action accrues upon the

accrual); *Hinman v. Yakima Sch. Dist. No. 7,* 69 Wash.App. 445, 850 P.2d 536, 539 (1993); *Turner v. IDS Financial Srvs., Inc.,* 471 N.W.2d 105, 107–08 (Minn.1991); *St. Petersburg Motor Club v. Cook,* 567 So.2d 488, 489 (Fla.Dist.Ct.App.1990); *Naylor v. W.Va. Human Rights Comm'n,* 180 W.Va. 634, 378 S.E.2d 843, 845–46 (1989); *Hilmes v. Dep't. of Indus., Labor & Human Relations,* 147 Wis.2d 48, 433 N.W.2d 251, 253–54 (Ct.App.1988); *Quicker v. Colo. Civil Rights Comm'n,* 747 P.2d 682, 683 (Colo.Ct.App.1987); *Humphreys v. Riverside Mfg. Co.,* 169 Ga.App. 18, 311 S.E.2d 223, 224–25 (1983); *Queensborough Cmty. College of City Univ. of N.Y. v. State Human Rights Appeal Bd.,* 41 N.Y.2d 926, 394 N.Y.S.2d 625, 363 N.E.2d 349, 349 (1977) (memorandum) (pre-dates *Ricks).  See also Clarke v. Living Scriptures, Inc.,* 114 P.3d 602, 604–05 (Utah Ct.App.2005) (adopting *Ricks* for purposes of breach of employment contract case); *Cintron v. E.L.A.,* 127 D.P.R. 582 (P.R.1990) (statute provides for date of accrual); *Smith v. City of Gardendale,* 508 So.2d 250, 252 (Ala.1987) (citing to *Ricks* in affirming the dismissal of a discriminatory zoning case as time-barred because the homeowner's action accrued when he received notice of the set back ordinance violation); 86 Op. Att'y Gen. 1014 (Del.1986) (citing to the *Ricks/Chardon* rule in stating that an individual claiming discrimination in employment should be allowed to file a charge as early as possible).

14. *Collins v. Comerica Bank,* 468 Mich. 628, 664 N.W.2d 713, 716 (2003); *Alderiso v. Med. Ctr. of Ocean County,* 167 N.J. 191, 770 A.2d 275, 277, 281 (2001); *Renegar v. R.J. Reynolds Tobacco Co.,* 145 N.C.App. 78, 549 S.E.2d 227, 229 (2001); *Oker v. Ameritech Corp.,* 89 Ohio St.3d 223, 729 N.E.2d 1177, 1179–80 (Ohio 2000); *Stupek v. Wyle Labs. Corp.,* 327 Or. 433, 963 P.2d 678, 682 (1998); *Romano v. Rockwell Int'l, Inc.,* 14 Cal.4th 479, 59 Cal.Rptr.2d 20, 926 P.2d 1114, 1122 (1996); *Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 879 P.2d 1037, 1043–44 (1994); *In re Pritchard,* 137 N.H. 291, 627 A.2d 102, 103 (1993); *Allison v. Jumping Horse Ranch, Inc.,* 255 Mont. 410, 843 P.2d 753, 756 (1992) (holding that a discharge claim does not accrue until all salary benefits are terminated).  *See also Kuhn v. Oehme Carrier Corp.,* 255 F.Supp.2d 458, 467 (E.D.Pa.2003) (applying Pennsylvania law) (holding that accrual began, at the latest, on the plaintiff's last day of work); *Fellows v. Earth Const., Inc.,* 794 F.Supp. 531, 536 (D.Vt. 1992) (applying Vermont law) (holding that accrual began, at the latest, on date of plaintiff's discharge); *Shields v. Gerhart,* 155 Vt. 141, 582 A.2d 153, 156–57 (1990) (rejecting the *Ricks/Chardon* rule in a retaliatory license revocation case where court held that claim accrued when plaintiff withdrew applications for a new license).

employee's receipt of an anticipatory discharge notice, many have done so with little analysis or discussion. For example, in *Quicker v. Colorado Civil Rights Commission,* the Colorado Court of Appeals simply acknowledged that no Colorado authority previously interpreted Colorado's discriminatory discharge statute for limitations purposes and adopted the *Ricks* holding to fill the vacuum. 747 P.2d 682, 683 (1987). In *Humphreys v. Riverside Manufacturing Company,* the Court of Appeals of Georgia merely offered naked citations to *Ricks* and *Chardon* in its adoption of the rule. 169 Ga.App. 18, 311 S.E.2d 223, 225 (1983). These cases, and the others following *Ricks/Chardon,* appear to us to adopt the rule out of convenience because their state provisions are sufficiently similar to Title VII and that the Supreme Court has spoken on the federal side of the issue. On the other hand, those state appellate courts charting a different course than that plotted by *Ricks* and *Chardon* tend to devote themselves to greater analysis and consideration of the issues raised by the accrual question, perhaps due in part to a perceived need to justify more fully why they deviate from the "majority view".

The divergent opinions from Hawaii, California, and New Jersey seem to us to epitomize best the arguments gainsaying adoption of the *Ricks/Chardon* rule. The Supreme Court of Hawaii, in *Ross v. Stouffer Hotel Company,* 76 Hawai'i 454, 879 P.2d 1037 (1994), produced the first substantial opinion contrary to the *Ricks/Chardon* rule. The court there dealt with an employment discrimination regulatory scheme nearly identical to the one involved in the present case. *Ross,* 879 P.2d at 1038 n. 2. In fact, the Hawaii regulatory scheme, like the one in Maryland, involves one statute prohibiting a discriminatory discharge, *compare* Haw.Rev.Stat. § 378–2, *with* Montgomery County, Md., Code § 27–19, and another setting forth the limitations period. *Compare* Haw.Rev.Stat. § 378–4(c), *with* Md.Code, Art. 49B, § 42(b). In both cases, the meanings assigned to the statutory words "discharge" and "occurred" became dispositive. *Ross,* 879 P.2d at 1044.

In rejecting the *Ricks/Chardon* rule, the Hawaiian court examined the plain language of the statutes involved. *Id.*

That examination yielded a finding that "discharge" is commonly understood to mean the termination of employment and that "occurred" ordinarily refers to the past happening of some event. *Id.* Taken together in the context of an alleged discriminatory discharge, the words conveyed a sense that the statute of limitations only commences after the termination from employment. *Id.* The *Ross* court buttressed its holding that accrual occurs upon actual discharge by touting the virtues of a bright line rule benefiting employees and employers alike. 879 P.2d at 1044–45. As a practical matter, the court noted that most employees do not become aware of their legal remedies, or even suspect that they have a viable claim for discrimination, until after the actual discharge. *Ross,* 879 P.2d at 1045. Accordingly, a bright line rule favors the resolution of such claims on their merits, which in turn furthers the remedial purposes of the statutory scheme in the first instance. *Id.* Because employers ultimately control the time that notice of discharge is delivered and the actual termination is executed, the threat of stale claims may be limited effectively. *Id.* Finally, a bright line rule brings certainty and simplicity to an otherwise confounding decision of when an employee might be, or should have been, aware of his or her cause of action. *Id.*

In the age discrimination case of *Romano v. Rockwell International Incorporated,* the Supreme Court of California echoed the same considerations noted by the high court of Hawaii: the plain language and remedial purpose of the wrongful discharge statute, limited burden on the employer, and simplicity of a bright line. 14 Cal.4th 479, 59 Cal.Rptr.2d 20, 926 P.2d 1114, 1122–23 (1996). The *Romano* Court added that were it to adopt the *Ricks/Chardon* rule such would "promote premature and potentially destructive claims, in that the employee would be required to institute a complaint ... while he or she still was employed, thus seeking a remedy for a harm that had not yet occurred." 59 Cal.Rptr.2d 20, 926 P.2d at 1123. The chances of conciliation between the employer and employee seriously would be jeopardized and judicial economy could be hampered by the possibility that suits will be filed based on a notice of termination that might later be

rescinded. *Id.* Moreover, it was noted that *Ross* distinguished the academic setting of the factual contexts of *Ricks* and *Chardon* from the other types of workplaces, in that a notification of termination in the other employment contexts does not lead inevitably to an actual discharge, as it does where denial of tenure is involved at an academic institution. 59 Cal. Rptr.2d 20, 926 P.2d at 1125. *Ross* was also noted as criticizing the rationale of *Ricks* for being contrary to the "customary principles of limitations law" because it requires an employee to dispute a termination that has not taken place yet. *Id.* (quoting *Chardon,* 454 U.S. at 9, 102 S.Ct. at 29 (Brennan, J., dissenting)).

The New Jersey cases departing from the *Ricks/Chardon* line of authority, *Alderiso v. Medical Center of Ocean County, Incorporated,* 167 N.J. 191, 770 A.2d 275 (2001) and *Holmin v. TRW Incorporated,* 330 N.J.Super. 30, 748 A.2d 1141 (2000), also discussed many of the same points raised by the Hawaiian and Californian high courts. The analysis in *Alderiso* started with an evaluation of the plain meaning of the statutorily undefined term "discharge." 770 A.2d at 280, 279. After settling on "discharge" as meaning the last day of paid salary, the New Jersey court referred to the reasoning in Justice Stevens's dissent in *Ricks* as more persuasive support for the clearer and simpler rule for the commencement of limitations on the actual termination date. *Alderiso,* 770 A.2d at 281. The *Holmin* case, which dealt with a claim for fraudulent inducement to retire, rather than a discriminatory discharge, analyzed and discarded the *Ricks/Chardon* rule for many of the same reasons already discussed *supra.* 748 A.2d at 1142. *Holmin* rejected the *Ricks/Chardon* rule as "arbitrary" and criticized those cases adopting it as lacking "any persuasive discussion of a sound policy basis" for doing so. 748 A.2d at 1151. Rather, the court praised the more compelling points made in the cases antedating the U.S. Supreme Court's decisions in *Ricks* and *Chardon*:[15] the termination decision may be

---

**15.** E.g., *Moses v. Falstaff,* 525 F.2d 92, 95 (8th Cir.1975); *Egelston v. State Univ. College,* 535 F.2d 752 (2d Cir.1976); *Bonham v. Dresser*

rescinded before its effective date; a bright line rule brings clarity to both the conciliatory and litigation processes; and no viable action can exist until the termination actually occurs. *Id.*

### C. We Reject the *Ricks/Chardon* Rule as Applied to the Present Case [16]

We find the collective rationales of the Hawaii, California, and New Jersey cases persuasive in interpreting our statutory scheme. Like the statutes involved in those cases, the pertinent language in Art. 49B of the Maryland Code and § 27–19 of the Montgomery County Code are not defined in the legislation. We therefore must utilize the

---

*Indus., Inc.,* 569 F.2d 187 (3d Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Krzyzewski v. Metro. Gov't,* 584 F.2d 802, 806 (6th Cir.1978); *Rubin v. O'Koren,* 621 F.2d 114, 116 (5th Cir.1980).

**16.** The parties have briefed and argued the present case as if it placed us at a jurisprudential crossroads requiring that we choose, for all employment discrimination claims, the path of the *Ricks/Chardon* rule or the minority alternative epitomized in the decisions of the high courts of Hawaii, California, and New Jersey discussed *supra.* Although we choose the latter in the present case, that may not necessarily be the case were we confronted with a context similar to that found in *Ricks* and *Chardon.* Even the *Ricks* Court acknowledged that its general principles must be applied "on a case-by-case basis" given the "widely varying circumstances" of discriminatory termination complaints. *Ricks,* 449 U.S. at 258 n. 9, 101 S.Ct. at 504 n. 9. Considering *Ricks* and *Chardon* in their particular context (the world of academic tenure decisions) and, more importantly, their appropriate analytical focus of identifying "precisely the 'unlawful employment practice'" plead, *Ricks,* 449 U.S. at 257, 101 S.Ct. at 503; *Chardon,* 454 U.S. at 8, 102 S.Ct. at 29, we might entertain a renewed argument that *Ricks* and *Chardon* should be followed in such circumstances. Where the only claimed discriminatory act is associated with the denial of tenure, regardless of whether employment in some capacity continues for some period, the cause of action for alleged wrongful denial of tenure properly may accrue from the notice of denial of tenure and not at some subsequent cessation of continued employment. That, of course, is not the case with regard to Haas's circumstances as pled in her complaint. Thus, we shall leave for another day whether the *Ricks/Chardon* rule would be adopted in Maryland regarding an allegation of discriminatory denial of academic tenure (or a tenure-like situation).

principles of statutory construction to determine the meaning of "occurrence" in Art. 49B, § 42(b) and "discharge" in Montgomery County Code § 27–19(a)(1)(A). We begin with the familiar command to effectuate the plain meaning of the language as conceived by the "ordinary, popular understanding of the English language." *Adventist Health Care Inc. v. Md. Health Care Comm'n,* 392 Md. 103, 124 n. 13, 896 A.2d 320, 333 n. 13 (2006) (quoting *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004)). The Court of Special Appeals appears to have sidestepped this principle in favor of relying on federal decisional law construing Title VII as a surrogate for analysis of the meaning of the terms used in the Maryland enactments. *Haas,* 166 Md.App. at 177, 887 A.2d at 681–82. While it certainly is permissible to have recourse to federal law similar to our own as an aid in construction of Maryland statutory law, it should not be a substitute for the pre-eminent plain meaning inquiry of the statutory language under examination. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738 n. 8, 625 A.2d 1005, 1011 n. 8 (1993) (citing *Metro. Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 27, 415 A.2d 582 (1980); *State v. Gross,* 134 Md.App. 528, 621, 760 A.2d 725, 774 (2000) (admonishing that persuasive federal law may be looked to, but not necessarily to the exclusion of independent judgment and analysis by Maryland courts).

Consultation with several popular dictionaries reveals that the commonly understood, plain meaning of "discharge" concurs with the view that a discharge occurs at the time the employee is terminated actually from employment.[17] In this

---

17. The Compact Oxford English Dictionary defines "discharge" as "dismissal from service, employment, or office." 442 (2d ed.1991). That dictionary then defines "dismissal" and its alternative "dismission" as the "deprivation of office, dignity, or position; discharge of service." *Id.* at 449. Likewise, "dismiss" means "to send away or remove from office, employment, or position; to discharge, discard, expel". *Id.* The emphasis in this definition unmistakably rests on the sending away of an employee rather than a notification of such an impending action. Other reference materials provide similar definitions. *See* Black's Law Dictionary 475 (7th ed.1999); Webster's New Universal Unabridged Dictionary 519 (2d ed.1983); Ballantine's Law Dictionary 352 (3d

regard, we agree with our sister courts who reached the same result. *See, e.g., Alderiso,* 770 A.2d at 280; *Romano,* 59 Cal.Rptr.2d 20, 926 P.2d at 1122; *Ross,* 76 Hawai'i 454, 879 P.2d 1037, 1044. Even were we to consider alternatively that the meaning of "discharge" was ambiguous, we are not bound by the Supreme Court's interpretation of Title VII in our interpretation of Art. 49B, as noted earlier, notwithstanding the arguable similarity in the two regulatory schemes.[18] Were we confronted with ambiguity regarding legislative intent, it is our duty to announce a rule that we are convinced is best supported by sound jurisprudential policy germane to the pursuit of legislative intent.[19] We said recently in *Stoddard v. State* that when supervening policy considerations outweigh the consensus interpretation of a rule according to the principles of statutory construction, we should not hesitate to make our conclusions based upon policy. 389 Md. 681, 704 n. 6, 887 A.2d 564, 577 n. 6 (2005). *Stoddard* held, contrary to the majority of other federal and state jurisdictions, that "a declarant's lack of intent to communicate a belief in the truth of a particular proposition is irrelevant to the determination of

---

ed.1969). Resource was had to similar dictionaries extant in 1974, the original vintage of the statutory language in question. *Harvey v. Marshall,* 389 Md. 243, 260 n. 11, 884 A.2d 1171, 1181 n. 11 (2005). No substantive differences with their successors was noted.

**18.** Respondent devoted a great deal of content in its brief to addressing the similarities between Art. 49B and Title VII. Also, the Court of Special Appeals cited to a number of Maryland cases in which appear statements that Art. 49B was either modeled on, or closely related to, Title VII. *Haas,* 166 Md.App. at 175, 887 A.2d at 680 (citing *Univ. of Md. at Baltimore v. Boyd,* 93 Md.App. 303, 311, 612 A.2d 305 (1992); *Pope–Payton v. Realty Mgmt. Srvs., Inc.,* 149 Md.App. 393, 402 n. 6, 815 A.2d 919 (2003); *Comm'n on Human Relations v. Mayor & City Council of Baltimore,* 280 Md. 35, 40–43, 371 A.2d 645 (1977)).

**19.** *See supra* note 10. We also note that the Supreme Court of New Jersey similarly claimed responsibility for interpreting its own laws independently of persuasive federal precedent in its decision on the same issue now before us. *Alderiso,* 770 A.2d at 281 ("Although federal decisional law may serve to guide us in our resolution of New Jersey issues, 'we bear ultimate responsibility for the safe passage of our ship.'" (quoting *State v. Cooke,* 163 N.J. 657, 751 A.2d 92, 99 (2000), in turn quoting *State v. Hempele,* 120 N.J. 182, 576 A.2d 793, 800 (1990))).

whether the words are hearsay when offered to prove the truth of that proposition." [20]   389 Md. at 703, 887 A.2d at 577.

We hold that, for the purpose of claims filed pursuant to § 42 of the Maryland Code, Article 49B, a "discharge" occurs upon the actual termination of an employee, rather than upon notification that such a termination is to take effect at some future date.   In doing so, we find more persuasive the reasoning employed by those states that have rejected the *Ricks/Chardon* rule in favor of the one we adopt today.

First, we consider the remedial nature and purpose of Article 49B. Our cases consistently refer to Article 49B as being remedial in nature. *See, e.g., Wholey v. Sears Roebuck,* 370 Md. 38, 52–53, 803 A.2d 482, 490 (2002); *State v. Sheldon,* 332 Md. 45, 63–64, 629 A.2d 753, 763 (1993) ("[W]hat is necessary are laws which *remedy* the effects of pernicious beliefs, *see e.g.* Maryland Code (1957, 1991 Repl.Vol.) Art. 49B (anti-discrimination laws), and which thereby force justice on those who are as yet unwilling to embrace it in their hearts and minds.") (emphasis added and removed); *Watson v. Peoples Sec. Life Ins. Co.,* 322 Md. 467, 484–85, 588 A.2d 760, 768 (1991); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 626, 561 A.2d 179, 190 (1989) ("In cases of discharge motivated by employment discrimination prohibited by Title VII and Art. 49B the statutes create both the right ... and *remedies* for enforcing that exception.") (emphasis added); *Vavasori v. Comm'n on Human Relations,* 65 Md.App. 237, 243, 500 A.2d 307, 310 (1985) ("The *remedy of Art. 49B* was created, regulated, and enforced by the State.") (emphasis added).   The remedies provided by Article 49B further the crucial objective of eliminating discrimination and advancing equal opportunity.

---

**20.** The *Stoddard* Court was interpreting the codified version of the common law hearsay rule contained in the Maryland Rules, which are enacted by this Court.   It matters not that the *Stoddard* Court was construing a rule of its own creation because the same principles of construction are applied in that endeavor as in the interpretation of statutes. *Gen'l Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005).   In particular, the Court must still ascertain objectively the intent of the rule's drafters. *Id.*

*Sheldon,* 332 Md. at 63–64, 629 A.2d at 763; *Equitable Life Assur. Soc. of U.S. v. Comm'n on Human Relations,* 290 Md. 333, 344, 430 A.2d 60, 66 (1981) ("The legislature in enacting and amending Article 49B leaves no room to doubt its intent and purpose, i.e., to eradicate the vestiges of discrimination in the categories designated."); *Comm'n on Human Relations v. Amecom Div. of Litton Sys., Inc.,* 278 Md. 120, 124, 360 A.2d 1, 4 (1976).

As a remedial statute, § 42 of Article 49B should be construed liberally in favor of claimants seeking its protection. *Montgomery County Bd. of Educ. v. Horace Mann Ins. Co.,* 383 Md. 527, 544, 860 A.2d 909, 919 (2004); *Harris v. Bd. of Educ. of Howard County,* 375 Md. 21, 38, 825 A.2d 365, 375 (2003) (quoting *Victory Sparkler & Specialty Co. v. Francks,* 147 Md. 368, 382, 128 A. 635, 640 (1925)) (" 'The Maryland act is remedial and should receive a liberal construction so as to give to it the most beneficial operation....' "); *Marsheck v. Bd. of Trs. of Fire & Police Employees' Retirement Sys. of City of Baltimore,* 358 Md. 393, 403, 749 A.2d 774, 779 (2000); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996) (quoting *Harrison v. John F. Pilli & Sons, Inc.,* 321 Md. 336, 341, 582 A.2d 1231, 1234 (1990)) ("[R]emedial statutes are to be liberally construed to 'suppress the evil and advance the remedy.' "). Nonetheless, we observed that "[t]he general rule of liberally construing remedial statutes is approached with caution when the scrutinized legislative scheme contains a statute of limitations." *Marsheck,* 358 at 403, 749 A.2d at 779. The workers compensation scheme at issue in *Marsheck,* however, differs markedly from the anti-discrimination scheme in the present case. Neither the Workers' Compensation Act,[21] nor its implementing regulations,[22] contain provisions requiring good faith attempts at conciliation and negotiation before litigation may be pursued. Both Article 49B and the

---

**21.** Md.Code (1957, 1999 Repl.Vol.) Labor & Empl. Article, §§ 9–101 *et seq.*

**22.** Code of Maryland Regulations 14.09.01 *et seq.*

Montgomery County anti-discrimination scheme mandate that such efforts be made.[23] Although § 42 allows a complainant, such as the Petitioner, to file a private civil suit to contest an alleged discriminatory discharge, subsection (c) of § 42 expressly requires that the complainant wait at least 45 days after he or she has filed a complaint with the county agency responsible for handling such matters. This provision presumably is meant to further judicial economy by having the County screen out non-meritorious claims as well as to encourage the conciliation of meritorious ones.[24]

The *Ricks/Chardon* rule frustrates this conciliation process whenever the actual discharge occurs after the expiration of the 45 day waiting period required by § 42(c).[25] Because the rule establishes that accrual begins upon notification, it behooves discharged employees to file a lawsuit as soon as possible to avoid having their claims barred under the statute of limitations. Thus, when the 45 day waiting period has run, but the employee has not yet been actually discharged, the *Ricks/Chardon* rule motivates the employee to file a lawsuit regardless of whether the conciliation process is concluded. As the states opting for other than the *Ricks/Chardon* rule have pointed out, this choice represents a poor public policy

---

**23.** Art. 49B, § 10(c); *Banach v. Comm'n on Human Relations*, 277 Md. 502, 513–14, 356 A.2d 242, 249–50 (1976); *McNutt v. Duke Precision Dental and Orthodontic Labs., Inc.*, 698 F.2d 676, 678–79 (4th Cir.1983) ("Moreover, the enforcement schemes contemplated by Maryland's Article 49B and 42 U.S.C.A. § 1981 are completely different. Maryland's administrative proceeding is designed primarily to 'eliminate the discrimination by conference, conciliation, and persuasion.' If a process of conference, conciliation and persuasion is to be effective, claims must be fresh. The older they are the less the likelihood of successful administrative adjustment.") (citation omitted); Montgomery County Code 27–7(g).

**24.** Haas waited the prescribed 45 days to file her suit in Circuit Court. In the present case, however, the goal of conciliation was not as prime a consideration because Haas was able to secure other employment subsequent to her termination.

**25.** This is not the case here, where Petitioner was terminated 14 days after the notification of her layoff. The principle remains true nonetheless.

where either a chilling effect on the employee filing in the most timely manner occurs, or the employee sues his or her employer before the termination becomes final, thus dooming any chance at conciliation. *See Holmin,* 748 A.2d at 1151; *Romano,* 59 Cal.Rptr.2d 20, 926 P.2d at 1123. To be sure, the *Ricks/Chardon* rule provides an effective means of avoiding lawsuits for discriminatory discharge: the "sharp" employer might set the effective date of termination at one day after whatever the statutory period is will have run its course. The majority of employees put on notice that they are slated to be terminated at some relatively remote date in the future likely would hesitate to institute a claim for discriminatory discharge; first, because the action may not appear final because it is so far in the future and; second, because they reasonably are apprehensive about suing the party with whom they currently have, and may try to maintain, a job.

In the same vein as the conciliation consideration is the contention that the *Ricks/Chardon* rule propagates the filing of claims not yet ripe for adjudication. Under the rule, it is possible theoretically that employees who challenge their putative discharge could arrive for their day in court before they actually are discharged from employment. Further, *Ricks* and *Chardon* create a paradoxical situation where an employee, at the time he or she is notified of the termination yet to come, must possess the prescience to know of the future "discriminatory acts that continue[ ] until, or occur[ ] at the time of, the actual termination of his [of her] employment." *Ricks,* 449 U.S. at 257, 101 S.Ct. at 504; *see also Chardon,* 454 U.S. at 8, 102 S.Ct. at 29. If employees desire to challenge their terminations specifically, as opposed to other discriminatory acts preceding it, they probably ought not be expected to file a claim disputing events that have not yet come to pass.

A significant consideration supporting our conclusion today is the relative simplicity in application of a bright line rule in this context. For courts, the determination of a statute of limitations question is made simpler thereby, obviating the need for the sometime tortured analysis under the "discovery rule" for when notice is adequate. For employees, the rule we

announce today is clear and logical. Most workers reasonably expect that, until actually discharged, they have no claim for wrongful discharge because there has yet to be harm that may be remedied. *See Ross*, 879 P.2d at 1045. The rule 'we announce today best facilitates the remedial purposes of Article 49B by making certain that meritorious suits are not foreclosed for purely technical reasons. For employers, our holding makes clear how their record-keeping and termination proceedings must be approached in order to defend properly against a wrongful discharge action. Employers are far less inconvenienced, if at all, by our holding today than employees would be if we followed the *Ricks/Chardon* rule. The entirety of the termination process is within the control of the employer, as opposed to the employee who should not have to guess whether or what type of termination notice is final so that he or she then may decide when to sue an employer who is still paying a wage and providing benefits. This delicate situation is best resolved in this manner.

Our holding should not deter employers from offering their employees advance notice of terminations. Indeed, there should be no great burden or adverse effect on employers because notice periods typically would not be of great duration in advance of the actual discharge. Our rule prevents the possibility of employers using exceptionally long notice periods for the purpose of deterring an employee from filing a discharge claim out of apprehension that they will be terminated earlier than scheduled.

■ The specter of employers having to defend against stale claims is not a persuasive argument. We have noted that "[o]ne principal purpose of statutes of limitations is to provide defendants with notice of a claim within a sufficient period of time to permit the defendant to take necessary steps to gather and preserve the evidence needed to defend against the suit." *Philip Morris USA, Inc. v. Christensen,* 394 Md. 227, 256, 905 A.2d 340, 357–58 (2006); *see also Hecht v. Resolution Trust Corp.,* 333 Md. 324, 338, 635 A.2d 394, 401 (1994). From the defendant's perspective, the statute of

limitations is remedial. *Marsheck v. Bd. of Trs. of the Fire & Police Employees' Retirement Sys. of City of Baltimore*, 358 Md. 393, 404–05, 749 A.2d 774, 779–80 (2000). "Once the limitation period passed, the statute, which once provided opportunity, closes the window and the claim is barred thereafter. The legislature, in drafting such legislation, implicitly recognizes that as time passes, difficult evidentiary issues arise, such as proof of the cause of injury, faded memories, and the availability of witnesses." *Marsheck*, 358 Md. at 404–05, 749 A.2d at 780; *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983); *Bertonazzi v. Hillman*, 241 Md. 361, 367, 216 A.2d 723, 726 (1966). Statutes of limitation are also meant to eliminate, after the allotted time, the financial uncertainty defendants experience while potential claims remain unlitigated. *Marsheck*, 358 Md. at 405, 749 A.2d at 780. The time allotted usually has little, if any, specific grounding in empirical logic, but " 'simply represents the legislature's judgment about the reasonable time needed to institute suit.' " *Marsheck*, 358 Md. at 405, 749 A.2d at 780 (quoting *Doe v. Maskell*, 342 Md. 684, 689, 679 A.2d 1087, 1089 (1996)).

The concerns animating the statute of limitations defense in most cases simply are not present here. As we have noted, employers ordinarily are in control of the termination process, so they may not maintain credibly an argument that they would be without adequate notice of a wrongful discharge action. The decision and execution of a discharge, along with records thereof, easily may be orchestrated in harmony with our holding today to ensure that an employer-defendant is not caught unaware of an unlawful discriminatory discharge claim. In the majority of instances, the time elapsed between the rendition of notice and effectuation of a termination is not so long as to foster relevant evidence falling victim to fading memories, missing documentation, or other spoliation concerns. The voluminous record of thorough depositions, internal e-mails, and other materials created in the present case is testament to this prediction. We also observe, merely in passing, that "[t]he statute of limitations, as a

defense that does not go to the merits, is disfavored in law and is to be strictly construed." *Marsheck,* 358 Md. at 405, 749 A.2d at 780 (quoting *Newell v. Richards,* 323 Md. 717, 728, 594 A.2d 1152, 1157 (1991)).

Finally, we resolve the contention that a statement regarding the *Ricks/Chardon* rule in *Towson University v. Conte,* 384 Md. 68, 96–97, 862 A.2d 941, 957 (2004), signaled our adoption of the rule. The brief discussion of the rule in the majority opinion in *Conte* was merely in response to an argument made by the dissent in that case, *id.,* and represented nothing more than a disputation that the rule, which dealt with an allegation of a civil rights deprivation, was inapposite to a breach of contract action. *Id.* In the present case, where *Ricks/Chardon* is arguably the most apposite, we hold that it should not be followed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

BATTAGLIA, J., dissenting, in which RAKER, J. joins in Part A:

I respectfully dissent.

## A.

Section 42 of Article 49B (b)(1) provides that claims for discrimination in Prince George's, Montgomery, and Howard Counties "be commenced in the circuit court for the county in which the alleged discrimination took place not later than 2 years after the *occurrence of the alleged discriminatory act.*" Maryland Code (1957, 1998 Rep. vol.), § 42(b)(1) of Article 49B (emphasis added). Section 27–19 of the Montgomery County Code provides that an employer must not "fail or

refuse to hire, fail to accept the services of, discharge any individual, or otherwise discriminate against any individual" on the basis of race, gender, religion, or other discriminatory grounds. Montgomery County Code, § 27–19 (2001) (emphasis added).

In this case, the Petitioner, Suzanne Haas, alleged in her complaint that "[t]he actions of Lockheed [Martin] in terminating [her]" from her position as Program Administrator constituted "handicap discrimination" because "Lockheed clearly regarded Haas as being disabled" on account of her Attention Deficit Hyperactivity Disorder. Although she physically left her employment on October 23, 2001, because of her employer's sufferance, the statute of limitations began to run on October 9, 2001, when Lockheed Martin notified Ms. Haas by letter of the termination of her position.

Our jurisprudence, as well as that of the Supreme Court, federal circuit courts of appeals, and the majority of our sister states supports this result. The majority, however, rejects not only our precedent, but the plethora of cases that reach the opposite result in order to accommodate negotiation and conciliation between employers and employees, efforts which the majority concedes were not the basis for Ms. Haas's delay in filing suit.

In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court addressed the instant issue. In *Ricks*, a professor alleged that the Delaware State College discriminated against him in its decision to deny him tenure. The trial judge dismissed the professor's claim on the ground that it was untimely filed because the discriminatory act occurred when the college made its decision not to grant the professor tenure; therefore, the statute of limitations had begun to run on the date that the professor was officially notified of the college's decision, rather than when he left his employment. The Supreme Court affirmed the District Court's ruling and held that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to [the professor]." *Id.* at 258, 101 S.Ct. at 504,

66 L.Ed.2d at 439–40. The Supreme Court noted that, although the alternative approach, in which the statute of limitations begins to run on the last day of employment, may provide a simpler approach, "Congress has decided that time limitations periods commence with the date of the 'alleged unlawful employment practice'," and that decision " 'reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones' ". *Id.* at 259, 260, 101 S.Ct. at 505, 66 L.Ed.2d at 440, 441, quoting *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295, 303 (1975). Further, the Court observed that the alternative "final day of employment" rule could discourage employers from giving employees a grace period to seek employment elsewhere. *Id.* at 260 n. 12, 101 S.Ct. at 505 n. 12, 66 L.Ed.2d at 441 n. 12.

The Supreme Court revisited this issue in *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), in which the plaintiffs alleged discrimination in the decision of the Puerto Rico Department of Education to terminate their employment. The trial court dismissed the claim as untimely, and the Court of Appeals for the First Circuit reversed, holding that the claims began to accrue not upon the plaintiffs' notification of the employer's decision to terminate them, but when their employment was actually terminated. The Supreme Court, in reversing, concluded that the *Chardon* and *Ricks* cases were indistinguishable; "in each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated." *Id.* at 8, 102 S.Ct. at 29, 70 L.Ed.2d at 8. Emphasizing that "reasonable notice cannot extend the period within which suit must be filed," the Supreme Court therefore held that the statute of limitations began to run when the plaintiffs were *notified* of their employer's final decision, not when their employment actually terminated. *Id.*[1]

---

1. The lower federal appellate courts have interpreted the *Ricks/Chardon* rule in termination cases to apply when the employee is notified of his

Although not controlling, Supreme Court precedent should be afforded deference because, as our colleagues on the Court of Special Appeals so recognized when they affirmed summary judgment for Lockheed Martin, Article 49B is patterned after Title VII of the Federal Civil Rights Act. *Montrose Christian Sch. Corp. v. Walsh,* 363 Md. 565, 580, 770 A.2d 111, 120 (2001) (stating that Article 49B of the Maryland Code "was modeled after the federal anti-discrimination law"); *Molesworth v. Brandon,* 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996) (concluding that, because Article 49B was modeled after federal law, the Court may look to the legislative history of Title VII of the Federal Civil Rights Act to discern the legislative intent behind Article 49B).

The General Assembly passed the Maryland Fair Employment Practices Law, codified at Article 49B, in response to the federal enactment of Title VII and acted so quickly that Article 49B went into effect one day before its federal counterpart. *See Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 607, 561 A.2d 179, 181 (1989). As Title VII has been updated at

---

or her termination from employment. *See Stewart v. Booker T. Washington Ins.,* 232 F.3d 844 (11th Cir.2000)(statute of limitations begins to run when employee is informed that she is being terminated); *Thomas v. Eastman Kodak Co.,* 183 F.3d 38 (1st Cir.1999) (holding that action for discrimination began to accrue when the employee was notified of lay-off); *Joseph v. N.Y. City Bd. of Educ.,* 171 F.3d 87 (2nd Cir.1999) (stating that action for discriminatory discharge begins to accrue when employee is notified of employer's discriminatory decision); *McCoy v. S.F., City & County,* 14 F.3d 28, 29 (9th Cir.1994) ("The touchstone for determining the commencement of the limitations period is notice."); *Lever v. N.W. Univ.,* 979 F.2d 552 (7th Cir.1992) (holding that action for gender discrimination accrued from time that professor was informed that she would not be given tenure); *English v. Whitfield,* 858 F.2d 957 (4th Cir.1988) (holding that discrimination claim brought under the Employee Protection Section of the Energy Reorganization Act was time-barred because the action began to accrue upon the employee's notification of her termination); *Janikowski v. Bendix Corp.,* 823 F.2d 945 (6th Cir.1987) (holding that discrimination claim brought under the Age Discrimination in Employment Act began to accrue upon the employee's notification of his termination); *Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.,* 667 F.2d 1074 (3d Cir.1981) (holding that action for discrimination accrued when the State Civil Service promulgated the eligibility roster for policemen which gave notice to the plaintiffs of the discriminatory decision).

the federal level, the General Assembly has harmonized Article 49B to federal law. *See* 1973 Md. Laws, Chap. 493; *Molesworth*, 341 Md. at 632–33, 672 A.2d at 614 (explaining that Chapter 493 of the Acts of 1973 states that it was passed to generally conform the State Fair Employment Practices Law to the 1972 Amendments of Title VII, Federal Civil Rights Act of 1964.); *Md. Comm'n on Human Relations v. Mayor and City Council of Baltimore*, 280 Md. 35, 40–43, 371 A.2d 645, 674–49 (1977) (noting that the General Assembly's amendments to Article 49B were needed to conform Maryland law to the 1972 amendments of Title VII and looking to Title VII of the Federal Civil Rights Act to define "person" as used in the newly conformed and reenacted § 18 of Article 49B). The Montgomery County Code also mirrors the unlawful employment practices prohibited by Title VII and Article 49B, differing only because the County Code contains a more expansive list of unlawful practices. Montgomery County Code § 27–1(b) (2001) ("The prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law."). Considering the mimicry of state and local laws to Title VII, it is appropriate to consider federal precedents when interpreting state and local laws.

The Majority concludes incorrectly that the "plain meaning of 'discharge' concurs with the view that a discharge occurs at the time the employee is terminated actually from employment." As used in § 27–19, the aspect of discharge that constitutes the "occurrence of the alleged discriminatory act" is the *decision* by the *employer* to terminate the employee. Maryland and Montgomery County's statutory scheme focuses on the discriminatory act and provides that an *employer* must not "discharge any individual," and that an employee has two years "after the occurrence of the alleged discriminatory act" to file a claim. Montgomery County Code, § 27–19(a); Maryland Code (1957, 1998 Rep. vol.), § 42(b)(1) of Article 49B. The notice to terminate incorporates the allegedly discriminatory decision and provides the basis for a claim under § 49B. An alleged discriminatory act occurs upon notice of termination. As the Supreme Court has stated, "the proper focus is on the time of the *discriminatory act*, not the point at which the

*consequences* of the act become painful." *Chardon,* 454 U.S. at 8, 102 S.Ct. 28 at 29, 70 L.Ed.2d at 9 (emphasis in original). Moreover, notice of termination is a very significant event—especially when the employee questions the legality of the employer's decision—and it is likely to cause the employee mental and emotional suffering.

The Majority relies on judicial decisions in Hawaii, California, and New Jersey that have declined to follow the *Ricks/Chardon* rule, but fails to consider that the reasoning of those courts was influenced by the underlying statutes and facts of those cases, all of which are significantly different than the statutes and facts in the case *sub judice.* In *Ross v. Stouffer Hotel Company,* 76 Hawai'i 454, 879 P.2d 1037 (1994), the statute of limitations at issue was 90 days long, as opposed to Maryland's generous two years. The *Ross* court based its decision on an analysis of the plain language, but then proceeded to further justify its departure from the *Ricks/Chardon* rule by emphasizing that less savvy employees would fail to pursue the filing of an administrative complaint within ninety days if the statute of limitations started upon notice. *Id.* at 1045. Maryland's two year statute of limitations guarantees the protection against discrimination by employers—even for less savvy employees—while also protecting employers from the burden of defending employment decisions that are long past.[2]

The employee in *Romano v. Rockwell International, Inc.,* 14 Cal.4th 479, 59 Cal.Rptr.2d 20, 926 P.2d 1114 (1996), was given notice in December 1988 that he would be terminated when he reached 85 service points under the company retirement plan, which would occur May 31, 1991. Thus, Romano had approximately one and a half years notice of his unequivocal termination. In construing the state's one year statute of limitations, the Supreme Court of California relied on *Ross*

---

**2.** In this particular case, Haas consulted with her attorney prior to signing the October 9, 2001 layoff notice, made allegations against the company in November 2001, and filed a charge of disability discrimination with the EEOC in March 2002. Haas did not file her lawsuit in Montgomery County Circuit Court until October 22, 2003.

and emphasized that adoption of *Ricks/Chardon* would require an employee to initiate a complaint while still employed. *Romano* addresses a unique set of facts and a shorter statute of limitations. Haas, like the majority of employees, received two weeks notice of her impending termination. If an employee in Maryland chooses not to file a claim while still working, the employee is in no way impeded from filing a claim in the next 102 weeks. Even when a *Romano*-like situation develops, the Supreme Court has made it clear that, "[i]t is true that 'the filing of a lawsuit might tend to deter efforts at conciliation.' But this is the 'natural effect of the choice Congress has made' in explicitly requiring that the limitations period commence with the date of the 'alleged unlawful employment practice' ". *Ricks,* 449 U.S. at 259 n. 11, 101 S.Ct. at 505 n. 11, 66 L.Ed.2d at 440 n. 11, quoting *Johnson,* 421 U.S. at 461, 95 S.Ct. at 1721, 44 L.Ed.2d at 302 (internal citations omitted). Furthermore, if the parties are able to reconcile their differences, the employee may nonetheless feel he or she was discriminated against and file a civil suit.

The New Jersey cases also are not persuasive. In *Alderiso v. Medical Center of Ocean County, Inc.,* 167 N.J. 191, 770 A.2d 275 (2001), a one year statute of limitations was at issue and the employee was given oral notice of termination. Maryland's statute is two years and Haas was given unequivocal notice in writing. *Holmin v. TRW, Inc.,* 330 N.J.Super. 30, 748 A.2d 1141 (2000), considered a claim for fraudulent inducement to retire, a claim subject to a six year statute of limitations.

Many of our sister courts, which also have espoused the date of notification approach, have done so on the grounds that it promotes and protects many important public policies. The Utah Court of Appeals in *Clarke v. Living Scriptures, Inc.,* 114 P.3d 602 (Utah Ct.App.2005), stated that a contrary approach

> would discourage employers from providing post-termination benefits. *See, e.g., Naton v. Bank of Cal.,* 649 F.2d 691, 695 (9th Cir.1981) ("[A] rule focusing on the date of termination of economic benefits might dissuade an employ-

er from extending benefits to a discharged employee after the employee has ceased working."); *Bonham v. Dresser Indus.*, 569 F.2d 187, 191–92 (3d Cir.1977) ("[W]e would . . . view with disfavor a rule that penalizes a company for giving an employee periodic severance pay or other extended benefits after the relationship has terminated rather than severing all ties when the employee is let go.").

*Id.* at 606. The Court of Appeals of Wisconsin in *Hilmes v. Department of Industry, Labor and Human Relations*, 147 Wis.2d 48, 433 N.W.2d 251 (Ct.App.1988), emphasized that "[k]eying an 'occurrence' of discrimination to a time prior to termination can afford the employee an opportunity to prevent—rather than rectify—wage loss and other harmful effects of the discriminatory practice." *Id.* at 254. The Supreme Court of Minnesota determined in *Turner v. IDS Financial Services, Inc.*, 471 N.W.2d 105 (Minn.1991), that the date of notification was the correct measure because at that time the plaintiff "immediately attains a lame duck status and, prior to actual discharge, may well incur employment agency fees and sustain damages for 'mental anguish and suffering' ". *Id.* at 108.

The last-day-of-employment approach, embraced by the majority for reasons not implicated in the present case, discourages employers from extending employment and other benefits beyond the date of notification, which provides employees a much needed grace period to locate alternative employment; conversely, the date-of-notification approach motivates both the employer and employee to begin conciliation as soon as possible, possibly avoiding wage loss and other harmful effects of the alleged discriminatory decision. The date-of-notification approach also recognizes and compensates for the fact that employees begin to accrue damages, both emotional and financial, from the time that the employer communicates what could be a discriminatory decision.

### B.

More importantly, however, I believe that the majority is wrong in rejecting the Supreme Court's *Ricks/Chardon* Rule

because it fits tongue and groove with this Court's long adherence to the discovery rule, which provides that the statute of limitations begins to run when the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury, damages or potential claim. *See Feldman v. Granger*, 255 Md. at 288, 291–97, 257 A.2d 421, 422–26 (1969). *See also Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167–68, 857 A.2d 1095, 1104 (2004); *Bank of N.Y. v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004); *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95–96, 756 A.2d 963, 973 (2000); *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 442–43, 749 A.2d 796, 800 (2000); *Pennwalt Corp. v. Nasios*, 314 Md. 433, 452, 550 A.2d 1155, 1165 (1988); *Waldman v. Rohrbaugh*, 241 Md. 137, 145, 215 A.2d 825, 830 (1966); *Hahn v. Claybrook*, 130 Md. 179, 187, 100 A. 83, 86 (1917). We adopted the discovery rule because it provides adequate time for diligent plaintiffs to initiate an action while also ensuring fairness to defendants by encouraging the prompt filing of claims, suppressing stale or fraudulent claims, and avoiding inconvenience which may stem from delay. *Frederick Rd. Ltd. P'ship*, 360 Md. at 94–95, 756 A.2d at 973; *Lumsden*, 358 Md. at 441–42, 749 A.2d at 799–800; *Pennwalt Corp.*, 314 Md. at 441, 550 A.2d at 1159; *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983); *Harig v. Johns–Manville Prods. Corp.*, 284 Md. 70, 75, 394 A.2d 299, 302 (1978); *Feldman*, 255 Md. at 297, 257 A.2d at 426 ("[T]he 'discovery rule' ... gives to the individual exercising reasonable diligence the full benefit of the statutory period in which to file suit, while at the same time protecting the defendant from 'stale claims,' as was intended by the statute.").

The discovery rule has been applied to determine the time of accrual of a plethora of various civil actions. *See, e.g., Callahan v. Clemens*, 184 Md. 520, 41 A.2d 473 (1945) (involving an action for negligent construction); *Mattingly v. Hopkins*, 254 Md. 88, 253 A.2d 904 (1969) (applying rule to action

against civil engineering firm); *Leonhart v. Atkinson*, 265 Md. 219, 289 A.2d 1 (1972) (involving accounting malpractice claim); *Watson v. Dorsey*, 265 Md. 509, 290 A.2d 530 (1972) (applying rule to legal malpractice claim); *Johns–Manville Prods. Corp.*, 284 Md. at 70, 394 A.2d at 299 (applying the rule to an action sounding in negligence and strict liability for latent diseases); *Lumsden*, 358 Md. at 435, 749 A.2d at 796 (involving action for breach of implied statutory warranty); *Bank of N.Y.*, 382 Md. at 235, 854 A.2d at 1269 (applying rule to action for legal malpractice and breach of fiduciary duty); *Dual Inc.*, 383 Md. at 151, 857 A.2d at 1104 (involving action for tortious interference with contractual relations). Moreover, in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), we concluded that there was "no valid reason why [the discovery] rule's sweep should not be applied to prevent an injustice in other types of cases," and held that the rule was "applicable generally in all [civil] actions." *Id.* at 636, 431 A.2d at 680.

In *Arroyo v. Board of Education of Howard County*, 381 Md. 646, 851 A.2d 576 (2004), we were called upon to determine when a school guidance counselor's claim against the Howard County Board of Education for wrongful termination began to run—upon notification of his termination, or upon the date of his actual termination. We concluded that, pursuant to Section 10–222(h) of the State Government Article, the employee was required to exhaust all administrative remedies before seeking judicial relief. *Id.* at 660, 851 A.2d at 584–85. Accordingly, the statute of limitations for the employee's claim began to run when the administrative agency made its *final* determination to terminate him. *Id.* at 667, 851 A.2d at 589. We explicated that, in measuring when the statute of limitations began to run,

[t]he dispositive issue ... is ascertaining when the plaintiff was put on notice that he may have been injured. It is manifest to this Court, after viewing *Hahn* and its progeny, that the statute of limitations on petitioner's civil claim of

wrongful termination began to run when he knew or reasonably should have known of the claimed wrong done to him, *i.e.,* his dismissal as an employee of the HCPSS.

*Id.* at 669, 851 A.2d at 590. Thus,

[i]t was the *act* of the State Board, in its affirmance of the County Board's decision to terminate petitioner from his employment, that was the final decision of the administrative agency and signified an exhaustion of petitioner's administrative remedies. It was no later than this point *that petitioner's injury "accrued." And it was no later than this point that he knew, or should have known of the "injury."*

*Id.* at 671, 851 A.2d at 591 (second emphasis added).

Although *Arroyo* involved an action under the State Government Article, the principles set forth in that case equally apply to the case *sub judice.* The statute of limitations on Ms. Haas's claim began to run when she "knew or reasonably should have known of the claimed wrong done to" her, that time being when she was notified by Lockheed Martin that her position was being eliminated.

For these reasons I would affirm the judgment of the Court of Special Appeals and hold that Ms. Haas filed her action in an untimely fashion.

Judge RAKER has authorized me to state that she joins in Part A of this dissenting opinion.